**PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, INC. and Friends of the Earth**

v.

**POWELL DUFFRYN TERMINALS INC., Appellant,**

**United States Environmental Protection Agency, Intervenor.**

**PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, INC. and Friends of the Earth, Appellants**

v.

**POWELL DUFFRYN TERMINALS INC.**

**PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, INC. and Friends of the Earth**

v.

**POWELL DUFFRYN TERMINALS INC.**

**Appeal of William B. REILLY, in his capacity as Administrator, United States Environmental Protection Agency.**

**Nos. 89–5831, 89–5851 and 89–5861.**

United States Court of Appeals, Third Circuit.

Argued May 21, 1990.

Decided Aug. 20, 1990.

Rehearing Denied Oct. 11, 1990.

---

Nathan M. Edelstein (argued), Ridolfi, Friedman, Frank, Edelstein & Bernstein, Lawrenceville, N.J., for appellant/cross appellee Powell Duffryn Terminals, Inc.

Bruce J. Terris (argued), Kathleen L. Millian, Terris, Edgecombe, Hecker & Wayne, Washington, D.C., Edward Lloyd, Trenton, N.J., for appellee/cross appellant Public Interest Research Group of New Jersey, Inc. and Friends of the Earth.

Charles J. Sheehan (argued), Lee M. Kolker, U.S. Dept. of Justice, Land & Natural Resources Div., Office of Policy, Legislation and Sp. Litigation, Washington, D.C., for Intervenor U.S.E.P.A.

Before SCIRICA, NYGAARD and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

In this Clean Water Act citizen suit, the district court granted summary judgment to plaintiffs Public Interest Research Interest Group of New Jersey and Friends of the Earth (collectively "PIRG"), finding that defendant Powell Duffryn Terminals, Inc. ("PDT") had violated its National Pollution Discharge Elimination System ("NPDES") permit 386 times over a period of six years. After a bench trial on the issue of penalties, the district court permanently enjoined PDT from violating the terms of its NPDES permit and assessed $3,205,000 in civil penalties. Both parties appeal. We will affirm in part and reverse in part.

### I. Background Facts and Procedural History

The Federal Water Pollution Control Act ("the Act") was enacted by Congress in 1972. The purpose of the Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" with the goal "that the discharge of pollutants into the navigable waters be eliminated by 1985." 33 U.S.C. § 1251(a)(1).

The Act provides an effective mechanism for monitoring and limiting polluting discharges. Section 301(a) flatly prohibits anyone from discharging any pollutant except as permitted by the Act. 33 U.S.C. § 1311(a). A person wishing to discharge into the navigable waters must obtain a National Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1342. These permits contain detailed limits (or parameters) on the types and concentrations of pollutants a permit holder may discharge. A person who complies with the permit parameters is deemed to comply with the Act. 33 U.S.C. § 1342(k). The Act further requires permittees to install and maintain equipment to test its effluent. 33 U.S.C. § 1318(a). The test results must then be reported to the Environmental Protection Agency ("EPA") on Discharge Monitoring Reports ("DMRs"). 40 C.F.R. §§ 122.41(j) & 122.48 (1989). A comparison of the permit limits with the reported concentrations quickly reveals whether a permittee is complying with its permit. Finally, the Act permits aggrieved citizens to sue permit violators. 33 U.S.C. § 1365.

PDT, a New Jersey corporation, is an NPDES permit holder operating a bulk storage facility in Bayonne, New Jersey. This tank farm is located on land adjacent to the Kill Van Kull, a navigable body of water. PDT uses the large tanks at the site to store various liquids owned by others. These liquids include petroleum products and industrial chemicals. When liquids are transferred, some spillage occurs. The spillage mixes with rainwater and the run-off pollutes the Kill Van Kull.

When PDT acquired the facility, it was subject to an injunction issued by the United States District Court for the District of New Jersey. *United States v. El Dorado Terminals Corp.*, CA No. 77–228 (D.N.J. April 14, 1977). The injunction required the site owner to build a wastewater treatment plant by July 1, 1977 to treat the polluted run-off. After purchasing the facility, PDT did some remedial work at the site, mainly paving and constructing some ditches and dikes to channel the rainwater. PDT did not, however, construct the required wastewater treatment plant until 1987.

Since 1974, PDT (or its predecessor in interest) has held a series of NPDES permits which allowed it to discharge effluent into the Kill Van Kull. PDT's DMRs indicate that PDT (or its predecessor) has consistently and uninterruptedly dumped pollutants into the Kill Van Kull in concentrations greater than that allowed by its permit.

Plaintiffs are non-profit corporations concerned with environmental issues. On January 27, 1984, they filed a citizen suit against PDT pursuant to section 505 of the Act, 33 U.S.C. § 1365(a)[1], seeking a judgment of liability, civil penalties and injunctive relief, alleging that PDT was violating its NPDES permit. PIRG gave the required sixty-day notice of suit to the EPA and the New Jersey Department of Environmental Protection. 33 U.S.C. § 1365(b).

The district court bifurcated the case, with liability to be determined first and civil penalties and injunctive relief, if any, to be considered afterward. PIRG moved for summary judgment on the issue of PDT's liability. PDT opposed the motion, alleging that PIRG lacked standing and that material facts as to liability were in dispute.

The district court granted PIRG's motion for summary judgment in an order dated January 13, 1986, finding that PIRG had standing and that PDT had violated its NPDES permit 154 times from July, 1977 to June, 1984. *Student Public Interest Group of New Jersey, Inc. v. P.D. Oil & Chemical Storage, Inc.*, 627 F.Supp. 1074 (D.N.J.1986) ("PIRG I"). PIRG submitted another motion for summary judgment alleging that PDT continued to violate its permit during the litigation. On March 13, 1987, the district court granted summary judgment to PIRG on an additional 46 violations.

PIRG moved for a preliminary injunction on May 17, 1988 to enjoin further permit violations by PDT. The district court denied this motion in part because PIRG had failed to demonstrate that irreparable harm was imminent.

PIRG filed its third and final motion for summary judgment on liability on December 29, 1988, alleging an additional 190 violations. Four items were erroneously included and PIRG later removed them from the list. PDT again opposed summary judgment. On May 4, 1989, the first day of the bench trial on penalties, the district court granted PIRG's motion for summary judgment, bringing the total number of PDT's violations to 386.

Following a one week bench trial on the issue of penalties, the district court found that PDT had consistently violated its permit and should be assessed the maximum penalty. *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 720 F.Supp. 1158 (D.N.J.1989) ("*PIRG II*"). The court based the fine on the seriousness of the violations, the large economic benefit reaped by PDT by delaying compliance, the lack of good faith efforts by PDT to comply with its NPDES permits and the fact that the penalty would not threaten PDT's economic survival. After calculating the maximum penalty to be $4,205,000,[2] the district court reduced the

---

**1.** This section states, in relevant part:
Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf—
 (1) against any person ... who is alleged to be in violation of ... an order issued by the

Administrator or a State with respect to ... [an effluent] standard or limitation....
33 U.S.C. § 1365(a)(1).

**2.** Before 1987, section 309(d) of the Act provid-

penalty by $1,000,000 because the EPA and the NJDEP had failed to diligently prosecute PDT. The district court ordered PDT to pay the $3,205,000 into a trust fund to be used for improving the environment in New Jersey. Finally, the district court entered a permanent injunction prohibiting PDT from violating its permit. *PIRG II*, 720 F.Supp. at 1168.

PDT contends that the district court erred by failing to dismiss the case because the plaintiffs lack standing, by failing to apply a five year statute of limitations and by granting summary judgment on liability. PDT also contends that the district court's factual findings supporting the award of civil penalties are clearly erroneous and that the injunction is overbroad. PIRG contends that the nonfeasance of the EPA and the NJDEP is an illegitimate basis for reducing the penalty. Although the EPA was not a party below, we permitted the EPA to intervene to contest the creation of a private trust fund with the civil penalties.

## II. Standing

■ The requirement that a party have standing flows from the Article III requirement of a "case or controversy."[3] U.S. Const. art. III, § 2, cl. 1. Standing analysis focuses on whether "a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Sierra Club v. Morton*, 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31

L.Ed.2d 636 (1972). PIRG seeks to represent the interests of its members. Such "representational standing" is appropriate where 1) the organization's members would have standing to sue on their own, 2) the interests the organization seeks to protect are germane to its purpose, and 3) neither the claim asserted nor the relief requested requires individual participation by its members. *See Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Automobile Workers v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986). PDT contends that PIRG's individual members would not have standing to pursue this suit on their own, so PIRG lacks standing to sue.

■ For individual standing, the Supreme Court states that:

at an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," ... and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision...."

*Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). PDT argues that PIRG failed to establish injury in fact, failed to trace any injury to PDT's conduct and failed to show

---

ed for a civil penalty "not to exceed $10,000 per day of such violation." 33 U.S.C. § 1319(d) (1986). This section was amended effective February 4, 1987 to allow a civil penalty "not to exceed $25,000 per day for each violation." 33 U.S.C. § 1319(d) (1987). The district court calculated the maximum penalty by multiplying the 363 violations occurring before February 4, 1987 by $10,000 and the 23 violations occurring after that date by $25,000.

**3.** In addition to constitutional considerations, there are prudential limitations that may lead a court to deny standing. In this case, we need not consider such prudential limitations since the Act explicitly confers standing to the limits of the constitution. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) ("Congress may grant an express

right of action to persons who otherwise would be barred by prudential standing rules.") Section 505(a) of the Act allows a citizen to bring a civil action against any person "who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation...." 33 U.S.C. § 1365(a)(1). Section 505(g) further defines "citizen" as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). The legislative history of this section indicates that Congress intended by this language to incorporate the definition of standing set forth in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). *See* 1972 U.S.Code Cong. & Admin.News 3668, 3776, 3823; *Middlesex County Sewage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 16, 101 S.Ct. 2615, 2624, 69 L.Ed.2d 435 (1981).

how this lawsuit could redress any of PIRG's injury. The district court found otherwise. *See PIRG I,* 627 F.Supp. at 1081–83. PDT originally challenged PIRG's standing in a motion to dismiss. Since additional evidence was submitted on this issue, the district court properly treated the motion as one for summary judgment. Fed.R.Civ.P. 12(b). The district court decided that PIRG had standing and refused to dismiss the action. In reviewing this decision, we view the evidence in the light most favorable to PIRG, the non-moving party. *Erie Telecommunications, Inc. v. City of Erie,* 853 F.2d 1084, 1093 (3d Cir.1988). Our review of this essentially legal question is plenary.

### A. *Injury in Fact*

█ PIRG asserted generally in its complaint that its members resided in the vicinity of or owned property on or near the Kill Van Kull, or recreated on or near the Kill Van Kull. Complaint ¶¶ 7, 9, Joint App. p. 44–45. PIRG supported these assertions by submitting affidavits from five members. All affiants state that they are members of one of the plaintiff organizations and reside in the vicinity of the Kill Van Kull. The affiants state that they hike, jog or bicycle along the shores of the Kill Van Kull. Several affiants state that they recreate in the Kill Van Kull Park, a public park located approximately two miles downstream of PDT. Although no affiant actually boated on the Kill Van Kull, apparently because of the foulness of the water, several indicated that they would boat, fish or swim there if the water were cleaner.[4] *See e.g.* Affidavit of Sheldon Abrams, Joint App. p. 2425.

The affiants claimed injury to their aesthetic and recreational interests because the Kill Van Kull is polluted. The affidavit of Douglas MacNeil represents the types of interests asserted. Mr. MacNeil lives in Westfield, N.J. and is a member of FOE. He stated that he hikes and birdwatches several times per year at the Kill Van Kull park, a park adjacent to the Kill Van Kull. Mr. MacNeil was particularly offended by the brown color and bad odor of the water. He stated that he would birdwatch more frequently and enjoy his recreation on the Kill Van Kull more if the water were cleaner.

These affidavits state an injury sufficient to satisfy the requirements of Article III. As the Supreme Court noted in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), harm to aesthetic and recreational interests is sufficient to confer standing. *Sierra Club,* 405 U.S. at 735, 92 S.Ct. at 1366; *Middlesex County,* 453 U.S. 1, 16–17, 101 S.Ct. 2615, 2624–25, 69 L.Ed.2d 435 (1981). These injuries need not be large, an "identifiable trifle" will suffice. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S..669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973). The interests asserted by the plaintiffs in this case are more than trifles. The pollution in the Kill Van Kull has interfered with these plaintiffs' enjoyment of this natural resource. Since PDT has not introduced any evidence to suggest that the affiants have not legitimately stated injuries in fact to their aesthetic and recreational interests in the Kill Van Kull. PIRG has satisfied the first prong of the *Valley Forge* test. *Accord Friends of the Earth v. Consolidated Rail Corp.,* 768 F.2d 57, 61 (2d Cir.1985) (affidavit by FOE member was sufficient to confer standing on organization where member stated that he drove on bridge over body of water and was offended by its appearance).

### B. *Fairly Traceable*

PDT contends that PIRG has failed to demonstrate that the injuries suffered by its members are fairly traceable to PDT's exceedances of its NPDES permit. In support of its motion for summary judgment on this issue, PDT submitted the affidavit of LeRoy Sullivan, an engineering consultant, who stated that to "a reasonable scientific certainty ... [PDT's] operations do not adversely affect water quality in the Kill Van Kull at or about the Kill Van Kull

---

**4.** For example, Andrew Gerbino stated that he would fish, clam and crab in the Kill Van Kull if the water were cleaner. Affidavit of Andrew Gerbino, Joint App. p. 2427.

Park.... It is also my opinion that [PDT's] operations do not adversely affect water quality in the Kill at any other location except perhaps in some purely speculative and theoretical way." Affidavit of Le-Roy Sullivan, p. 2, Joint App. p. 93. PDT also submitted the affidavit of Allen Dresdner, a professional planner and consultant, who testified to the heavily industrialized character of the Kill Van Kull and stated his opinion that the poor water conditions complained of by the plaintiffs did "not originate from Powell Duffryn nor are they related to Powell Duffryn's discharges." Affidavit of Allen Dresdner, p. 18, Joint App. p. 126.

In denying PDT's motion for summary judgment[5], the district court stated that PIRG could "show causation merely by showing violations of the discharge permits." *PIRG I*, 627 F.Supp. at 1083. PDT asserts that this is an erroneous statement of the law of standing and that *Valley Forge* and its progeny require a close causal link between the content of a defendant's effluent and the harm complained of by the plaintiffs.[6] Although we agree that a permit exceedance alone is not sufficient to satisfy the second prong of *Valley Forge*, the facts are sufficient here to trace PIRG's injuries to PDT's discharges.

The requirement that plaintiff's injuries be "fairly traceable" to the defendant's conduct does not mean that plaintiffs must show to a scientific certainty that defendant's effluent, and defendant's effluent alone, caused the precise harm suffered by the plaintiffs. A plaintiff need not prove

causation with absolute scientific rigor to defeat a motion for summary judgment.[7] The "fairly traceable" requirement of the *Valley Forge* test is not equivalent to a requirement of tort causation. *Cf. Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 78, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978).

■ The standing requirement ensures that parties will not "convert the judicial process into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'" *Valley Forge*, 454 U.S. at 473, 102 S.Ct. at 759 (quoting *United States v. SCRAP*, 412 U.S. 669, 687, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973)). In order to demonstrate that they are more than "concerned bystanders," plaintiffs need only show that there is a "substantial likelihood" that defendant's conduct caused plaintiffs' harm. *Duke Power Co.*, 438 U.S. at 75 n. 20, 98 S.Ct. at 2631 n. 20, 57 L.Ed.2d 595 (1978). In a Clean Water Act case, this likelihood may be established by showing that a defendant has 1) discharged some pollutant in concentrations greater than allowed by its permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs.[8]

■ This will require more than showing a mere exceedance of a permit limit. Thus if a plaintiff has alleged some harm, that the waterway is unable to support aquatic life for example, but failed to show that defendant's effluent contains pollutants

---

**5.** To the extent that PDT argues that summary judgment was inappropriate because of a dispute of material fact, we disagree. It was *PDT* which filed the motion to dismiss which was subsequently converted into a motion for summary judgment. PDT represented in filing this motion that PIRG had failed *as a matter of law to establish standing.* It cannot now argue that facts were in dispute and that a trial was necessary.

**6.** We note that *Valley Forge* itself provides little guidance, since the Court found that the plaintiffs had failed to establish injury in fact, and so never reached the question of causation. *Valley Forge*, 454 U.S. at 485–86, 102 S.Ct. at 765–66.

**7.** Of course, plaintiffs must, if challenged, prove their allegations at trial. In this case, however, PDT waived its right to cross-examine PIRG's members at trial and stipulated that standing should be decided based on the record as it stood at the time of the motion for summary judgment. Joint App. p. 615.

**8.** In many of these cases, there are several parties discharging into the affected waterway. In order to obtain standing, plaintiffs need not sue *every* discharger in one action, since the pollution of any one may be shown to cause some part of the injury suffered. The size of the injury is not germane to standing analysis. *SCRAP*, 412 U.S. at 689 n. 14, 93 S.Ct. at 2416 n. 14.

that harm aquatic life, then plaintiffs would lack standing. In this case, several affiants stated that the water had an oily or greasy sheen they found offensive.[9] PDT's permit contained limits on the oil and grease PDT could discharge in its effluent. Joint App. p. 2154. PDT's reports to the EPA indicate that PDT has discharged oil and grease in excess of these limits. Thus the aesthetic injury suffered by the plaintiffs may fairly be traced to PDT's effluent.[10] PIRG has satisfied the second prong of the *Valley Forge* test.

### C. Redressability

■ The final prong of the *Valley Forge* test requires that plaintiffs demonstrate that their injuries are "likely to be redressed by a favorable decision." *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758 (quoting *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976)). This requirement is closely related to the "fairly traceable" element. While the fairly traceable element focuses on the connection between the defendant's conduct and the plaintiff's injury, the redressability factor focuses on the connection between the plaintiff's injury and the judicial relief sought. *Allen v. Wright*, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984). PDT argues that PIRG has failed to demonstrate how civil penalties and injunctive relief could redress the injuries complained of by PIRG's members. PDT is simply wrong.

The purpose of the Act is to restore the chemical, physical and biological integrity of the nation's waters. Where a plaintiff complains of harm to water quality because a defendant exceeded its permit limits, an injunction will redress that injury at least in part. If PDT complies with its permit, the pollution in the Kill Van Kull will decrease. Plaintiffs need not show that the waterway will be returned to pristine condition in order to satisfy the minimal requirements of Article III.

There is also a connection between civil penalties and the injuries to PIRG's members. Where Congress has expressly granted a right of action and plaintiffs have shown "a distinct and palpable injury," plaintiffs "may invoke the general public interest in support of their claim." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206. The general public interest in clean waterways will be served in this case by the deterrent effect of an award of civil penalties. Penalties will deter both PDT specifically and other NPDES permit holders generally. Thus PIRG's members' injuries may be redressed by a favorable decision in this case. *See Student Public Interest Group of New Jersey, Inc. v. AT & T Bell Laboratories*, 617 F.Supp. 1190, 1200–01 (D.N.J.1985), *accord Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 890 F.2d 690, 695 (4th Cir.1989), *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109 (4th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989). Under current constitutional requirements this plaintiff has standing.

### III. Statute of Limitations

■ The district court held that no statute of limitations should apply to citizen suits brought under the Act because to do so would contravene the substantive federal policy of the Act. PDT argues that the five year federal statute of limitations con-

---

**9.** *See e.g.* Affidavit of Mylissa Ven Ditti, Joint App. p. 2431 (water was brown and greasy in appearance), Affidavit of Sheldon Abrams, Joint App. p. 2425 (water had an oily sheen), Affidavit of Andrew Gerbino, Joint App. p. 2425 (water had an oily sheen).

**10.** Plaintiffs need not show "to a scientific certainty" that the oil they saw came from PDT's effluent. This tort-like causation is not required by Article III and is apparently an attempt by PDT to negate the strict liability standard of the Act. Since the Act forecloses PDT from raising such an argument at the liability stage, PDT attempts to raise it under the guise of standing. Thus the affidavits submitted by PDT did not entitle it to summary judgment on the issue of standing. To negate PIRG's affidavits, PDT must show that either 1) that it does not discharge oil and grease into the Kill Van Kull in exceedance of its permit or 2) plaintiffs' statements that they saw oil on the water are "in fact untrue." *SCRAP*, 412 U.S. at 689, 93 S.Ct. at 2417.

tained in 28 U.S.C. § 2462 should apply.[11] PIRG does not attempt to defend the district court's reasoning, but nonetheless contends that no statute of limitations should apply. PIRG argues that since section 510 [12] of the Act, 33 U.S.C. § 1370, authorizes states to impose more stringent requirements on polluters than those provided by federal law, and since New Jersey imposes no limitations on similar actions brought under state environmental laws, *see New Jersey Department of Environmental Protection v. Ventron Corp.*, 182 N.J.Super. 210, 440 A.2d 455, 463 (1981), *aff'd*, 94 N.J. 473, 468 A.2d 150 (1983), the more stringent state procedural rule should control.

The Act contains no relevant statute of limitations.[13] Ordinarily, we would look to state law and borrow the most relevant state limitations period. *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 158, 103 S.Ct. 2281, 2287, 76 L.Ed.2d 476 (1983). But where state statutes of limitation are "unsatisfactory vehicles for the enforcement of federal law ..., it may be inappropriate to conclude that Congress would choose to adopt state rules at odds with the purpose or operation of federal substantive law." *Id.* at 161, 103 S.Ct. at 2289. Especially where there is a relevant federal statute of limitations, courts need not borrow from state law. *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 367, 97 S.Ct. 2447, 2455, 53 L.Ed.2d 402 (1977), *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975).

The federal statute identified by PDT in this case is relevant, because citizen suits under the Act are brought to enforce a civil fine. By its terms, it would apply to an EPA proceeding under the Act. *See Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1521 (9th Cir.1987). Since plaintiffs in a citizen suit are acting as an adjunct to government enforcement actions, *Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 383, 98 L.Ed.2d 306 (1987), citizens should be subject to the same limitations period as the government. The Act envisions a scheme whereby citizen suits supplement government efforts. Thus applying a different state law could frustrate this scheme by allowing citizens to bring suits where the government would be barred or vice versa.

The Court of Appeals for the Ninth Circuit has employed similar reasoning in *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517 (9th Cir.1987) to conclude that section 2462, rather than the California statute of limitations contained in the Porter–Cologne Water Quality Act, Cal.Code Civ.Proc. § 338(9), should apply to citizen suits under the Act. Analogizing a Clean Water Act citizen suit to a government enforcement or *qui tam* action, the court noted that citizen suit plaintiffs do not personally benefit from the suit. Since citizen plaintiffs "effectively stand in the shoes of the EPA," the court concluded that the federal statute of limitations should apply. *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d at 1522. This holding is consistent with decisions in other jurisdictions. *See e.g. Atlantic States Legal Foundation v. Al Tech Specialty Steel Corp.*, 635 F.Supp. 284, 287 (N.D.N.Y.1986), *Connecticut*

---

**11.** This section provides:

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462.

**12.** Section 510 provides, in relevant part:

Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State ... to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that ... such State ... may not adopt or enforce any effluent limitation ... which is less stringent ... than the effluent limitations ... under [the Act].

33 U.S.C. § 1370.

**13.** The Act does contain a limitations period for actions brought to challenge EPA's rules or decisions. 33 U.S.C. § 1369(b)(1).

*Fund for the Environment v. Job Plating Co.,* 623 F.Supp. 207, 213 (D.Conn.1985), *Friends of the Earth v. Facet Enterprises, Inc.,* 618 F.Supp. 532, 536 (W.D.N.Y. 1984).[14]

■ PIRG attempts to distinguish the decisions applying section 2462 by noting that they all involved state limitations periods shorter than that provided by section 2462. Thus, PIRG argues, no decision resolved the question of whether section 510 of the Act allows a state to adopt a longer limitations period than that allowed by federal law.

We are not persuaded that section 510 of the Act allows a state to adopt its own statute of limitations for citizen suits. The language of this section allows states to adopt "any requirement respecting control or abatement of pollution," so long as that requirement is not less stringent than the federal requirements. 33 U.S.C. § 1370(1)(B). We read this language as affording states considerable flexibility in setting more stringent effluent standards. Only a strained reading of this section would authorize states to set their own limitations periods for citizen FWCPA suits. Particularly since the right of citizens to sue under the Act was granted by Congress with the intent "to supplement rather than supplant governmental action," *Gwaltney,* 108 S.Ct. at 383, we conclude that section 510 does not implicitly authorize states to allow citizen suits where the EPA itself would be time barred.[15]

■ PIRG argues that if a five year statute of limitations is applied to this action, the time period should begin when the defendant filed its DMRs rather than at the time of the discharge. This makes sense since the responsibility for monitoring effluent rests with the defendant, 33 U.S.C. § 1318(a)(4)(A), and the public cannot reasonably be deemed to have known about any violation until the permit holder files its DMRs. Thus we hold that the five year statute of limitations period does not begin to run until the DMRs listing the violations are filed. *Accord Atlantic States Legal Found. v. Al Tech Specialty Steel Corp.,* 635 F.Supp. 284, 287 (N.D.N.Y.1986).

■ The Act requires citizen plaintiffs to give sixty days notice to the EPA and the state where the alleged violations occurred before filing a complaint. 33 U.S.C. § 1365(b)(1)(B). PIRG urges that the limitations period should be tolled from the time the plaintiffs file their sixty day notice letter until the complaint is filed. Since prior notice to an administrative agency is a jurisdictional prerequisite to filing suit, *cf. Proffitt v. Rohm & Haas,* 850 F.2d 1007, 1011 (3d Cir.1988), equitable considerations favor tolling the statute of limitations during the sixty days while the EPA considers whether to prosecute. We see no reason why citizen plaintiffs should be faced with what is effectively a two month shorter limitations period than that binding the EPA.[16] *Sierra Club v. Chevron U.S.A., Inc.,* 834 F.2d 1517, 1524 (9th Cir. 1987). The statute should not, however, be tolled until the lawsuit is actually filed.

**14.** We note, however, that the New Jersey district courts have consistently held for various reasons that no statute of limitations applies to citizen suits under the Act. *See Public Interest Research Group of New Jersey v. U.S. Metals Refining Co.,* 681 F.Supp. 237, 239 (D.N.J.1987), *Student Public Interest Research Group of New Jersey v. AT & T Bell Laboratories,* 617 F.Supp. 1190, 1202 (D.N.J.1985), *Student Public Interest Research Group of New Jersey v. Tenneco Polymers,* 602 F.Supp. 1394, 1398–1399 (D.N.J.1985). *But see, Public Interest Research Group of New Jersey v. Witco Chemical Corp.,* C.A. No. 89-3146, 1990 WL 66178 (D.N.J. May 17, 1990) (applying five year statute of limitations).

**15.** PIRG's argument that application of section 2462 will interfere with the New Jersey enforce-

ment scheme is without merit. The NJDEP may bring actions under New Jersey environmental law subject to New Jersey procedural rules. But citizens wishing to bring actions under the *federal* Act must satisfy the five year statute of limitations. In light of *Gwaltney's* recognition that citizens may not sue for wholly past violations, this issue only arises where, as here, there is a long history of permit exceedances.

**16.** The notice requirement was imposed by Congress to allow government enforcement agencies to prosecute permit violations of which they may not have been aware. S.Rep. No. 414, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News 3668, 3745.

That would permit citizens to file their sixty day notice and then delay filing the actual lawsuit as long as they wished, effectively extending the limitations period beyond that applicable to the government. *Id.* at 1524 n. 5. Thus, we conclude that the statute of limitations is tolled only for the statutory sixty day notice period. We will reverse the district court to the extent it held that no statute of limitations applies to citizen suits under the Act and remand for adjustment of the penalty award.[17]

## IV. Summary Judgment on Liability

In reviewing a grant of summary judgment, we apply the same test as the district court should have used initially. *Erie Telecommunications, Inc. v. City of Erie*, 853 F.2d 1084, 1093 (3d Cir.1988). PDT raises numerous objections to the summary judgment on the issue of liability. Although characterized by PDT as disputes of fact, the objections are actually disputes of law.[18] We will consider each objection in turn.

### A. *The Single Operational Upset Defense*

When Congress amended the Act in 1987, it added the following language to sections 309(c)(5), (d), & (g)(3):

For purposes of this subsection, a single operational upset which leads to simultaneous violations of more than one pollutant parameter shall be treated as a single violation.

33 U.S.C. § 1319(c)(5), (d), & (g)(3).[19]

PDT seizes upon this language and argues that, in all instances where one discharge violated more than one permit parameter, the district court erred by finding liability for more than one violation. PDT claims that this language indicates Congress intended that simultaneous violations in a single non-complying discharge constitute only a single violation.

■ We note initially that the single operational upset ("SOU") defense is *not* a defense to liability, but relates only to the amount of penalties the district court may impose.[20] The SOU defense is contained in subsections relating to calculation of penalties, *see e.g.* 33 U.S.C. § 1319(d), and by its terms it is limited to the subsection in which it is contained. Thus even if we were to find that PDT was entitled to invoke the SOU defense, this would not preclude summary judgment on liability. Since it could effect the calculation of penalties, we will consider PDT's argument. For the reasons that follow, we conclude that PDT is not entitled to the SOU defense.[21]

---

17. This lawsuit was filed on January 27, 1984. The violations alleged by plaintiffs date from September 1977. PDT contends that a five year limitations period will mean eighteen violations will be barred. Applying the foregoing rules, we calculate that only violations reported before November 28, 1978 are time barred. This means PIRG cannot obtain civil penalties for violations 1 through 12. On remand, the district court should adjust the penalty award accordingly.

18. PDT does raise some factual issues. These mostly concern PIRG's reading of the laboratory reports and DMRs PDT is required by law to keep. 40 C.F.R. § 122.41(j) (1989). We have carefully reviewed the record before the district court, keeping in mind the Supreme Court's admonition that a dispute of fact is material "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). We conclude that PDT failed to create a material dispute of fact so as to preclude entry of summary judgment.

19. The language in subsection 309(d) applies to civil penalties, the other subsections apply to criminal penalties and administrative actions.

20. Thus the SOU defense differs from the "upset" defense provided by the EPA's regulations. 40 C.F.R. § 122.41(n) (1989). This "upset" defense may be raised as an affirmative defense to liability. To qualify for this defense, a permit holder must meet certain requirements, including reporting the incident to the EPA within 24 hours. 40 C.F.R. § 122.41(n)(3)(iii) (1989). PDT argued before the district court that it was entitled to this defense. The district court found that PDT had failed to provide any evidence that it qualified for the "upset" defense. *PIRG I*, 627 F.Supp. at 1087.

21. In light of our determination that the SOU defense is not available to PDT for any of the exceedances, we need not reach the question of whether the amendment to section 1319(d) should be applied retroactively.

■ We do not agree with PDT that the SOU defense indicates Congress intends that any single discharge which violates several permit parameters be counted as a single violation.[22] The statute states that a "single operational upset," not any "single non-complying discharge," should be counted as one violation. While neither the statute nor the legislative history further define "single operational upset," we conclude that an "upset" means some unusual or extraordinary event. We are guided in our interpretation of this ambiguous statutory language by the reasonable interpretation given this term by the EPA. *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

The EPA has defined "single operational upset" as:

> An exceptional incident which causes simultaneous, unintentional, unknowing (not the result of a knowing act or omission), temporary noncompliance with more than one Clean Water Act effluent discharge pollutant parameter. Single operational upset does not include ... noncompliance to the extent caused by improperly designed or inadequate treatment facilities.

EPA Guidance Interpreting "Single Operational Upset," Addendum B to Brief of Intervenor EPA at p. 9.

This Guidance further defines an "exceptional" incident as a "non-routine malfunctioning of an otherwise generally compliant facility." *Id.*

■ PDT introduced no evidence that the violations in this case were the result of anything except PDT's own recalcitrance. There was no evidence that a sudden violent storm, or bursting tank, or other exceptional event caused these exceedances. It is disingenuous at best for PDT to argue that it was in a near continual state of operational upset for the six years of violations involved in this suit. We conclude that PDT has not demonstrated that it is entitled to the SOU defense for these violations.

### B. *Violations of the BOD and TSS Parameters*

PDT's permit contained limitations on the discharge of BOD (biochemical oxygen demand) and TSS (total suspended solids). PDT argues that any exceedances of these parameters should not result in liability under the Act,[23] since BOD and TSS limitations apply only to continuous dischargers and PDT discharged intermittently until May 1987.[24] In support of this argument, PDT submitted the affidavits of Dr. Jeffrey Waxman, an environmental consultant, Ronald Sprague, Corporate Secretary of PDT, and Leroy Sullivan.[25]

■ PDT asserts that BOD and TSS limits were automatically and inadvertently inserted in all permits, rather than just the permits of continuous dischargers. Whatever the merits of PDT's argument on the applicability of the BOD and TSS limits,

---

**22.** PDT relies on *United States v. Detrex Chemical Indus., Inc.*, 393 F.Supp. 735 (N.D.Ohio 1975) and the original district court opinion in *Chesapeake Bay Foundation, Natural Resources Defense v. Gwaltney of Smithfield, Ltd. I*, 611 F.Supp. 1542 (E.D.Va.1985), *aff'd*, 791 F.2d 304 (4th Cir.1986), *rev'd on other grounds*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). We do not find either of those cases relevant to this appeal. Those cases construed the pre–1987 language of section 1319(d), which specified that the maximum penalty was "not to exceed $10,000 per day of such violation." In the 1987 amendments to the Act, Congress amended the statutory language in section 1319(d) to allow a maximum penalty "not to exceed $25,000 per day for each violation." This amendment clarified that violations of the Act were to be counted on a parameter by parameter basis. *Atlantic States Legal Foundation v. Tyson Foods, Inc.*, 897 F.2d 1128, 1137–39 (11th Cir.1990).

**23.** PDT has not cited any case, statute or regulation to support its contention that the limits should not apply to intermittent dischargers.

**24.** With the installation of the Zimpro water treatment system in May 1987, PDT began discharging on a continuous basis. Since 1987, PDT has violated its BOD and TSS limitations twenty-two times.

**25.** PDT also attempts to rely on the testimony of former EPA employee Marian Casper to support its argument that BOD and TSS limits did not apply to PDT. This testimony was not before the district court at the liability stage, since Ms. Casper testified *only* at the trial on penalties.

section 509(b)(2) of the Act clearly states that EPA action in issuing a permit "shall not be subject to judicial review in any civil or criminal proceeding for enforcement." 33 U.S.C. § 1369(b)(2). Under New Jersey law, a permittee wishing to challenge a condition of a permit must request agency review within thirty days of the receipt of the permit. N.J.Admin.Code tit. 7, § 14A–8.9. The final agency determination may be appealed to the Appellate Division of the New Jersey Superior Court. N.J.R.. App.P. 2:2–3(a).[26]

Because PDT never challenged the BOD and TSS limits in its permit until PIRG brought this enforcement action, it may not challenge them now. By failing to challenge a permit in an agency proceeding, PDT has lost "forever the right to do so, even though that action might eventually result in the imposition of severe civil or criminal penalties." *Texas Mun. Power Agency v. EPA*, 836 F.2d 1482, 1484–85 (5th Cir.1988) (quoting *Texas Mun. Power Agency v. EPA*, 799 F.2d 173, 175 (5th Cir.1986)). *Accord Connecticut Fund for the Environment v. Job Plating Co.*, 623 F.Supp. 207, 216–17 (D.Conn.1985). The district court properly found that PDT was liable for exceeding the BOD and TSS parameters in its permits.[27]

### C. Counting of Violations

PDT argues that PIRG "double counted" violations and that the district court improperly granted summary judgment for these violations. PDT identifies essentially two varieties of overcounting. First, a single reported exceedance for a pollutant was counted as a violation of both the average concentration limit and the maxi-

mum concentration limit for that pollutant. Second, a single reported exceedance for a pollutant was counted as a violation of both the seven day discharge limit and the thirty day discharge limit for that pollutant.

■■■ PDT's first argument is easily refuted. PDT's permits provide limits for both the daily average and daily maximum concentration of certain pollutants. *See e.g.* 1978 NPDES Permit, Joint App. p. 2145. These are clearly separate limitations and we see no reason why PDT should not be penalized separately for violating each limitation.[28] While the permit requires that PDT test a minimum of three effluent samples there is no limit on the maximum number of samples that PDT may test. Therefore, if one sample contained a concentration in excess of the maximum for a particular pollutant, PDT could have taken measures to clean up its discharge and take more samples in the hope that later samples would have lower concentrations and so bring the daily average within the permit limits. PDT did not do so and therefore is subject to penalties for violating both the average and maximum concentration limits.

■■■ The second variety of overcounting alleged by PDT involves multiple limits for the same parameter. PDT contends that the district court erred by counting a single exceedance as a violation of both the seven day average limit and the thirty day average limit. PDT argues that section 309(d) of the Act prohibits multiple penalties for such a "single operational upset." As we held, the single operational upset defense of section 1319(d) is not available to PDT in

**26.** Because authority for administering the NPDES permit program has been delegated to New Jersey, the requirements of New Jersey law would control. *See* 33 U.S.C. § 1342(c). Under federal law, PDT would have had 120 days to appeal its permit to this court. *See* 33 U.S.C. § 1369(b)(1); *but see Connecticut Fund for the Environment v. Job Plating Co.*, 623 F.Supp. 207, 216 (D.Conn.1985) (permittee could have challenged permit in both state agency and federal court). This distinction is academic, since PDT failed to appeal its permit terms to anyone.

**27.** PDT's claim that liability for BOD and TSS violations would violate due process is utterly meritless. Due process was available to PDT, in the form of an administrative challenge to the permit. PDT was not denied due process; it simply failed to use the process available to it.

**28.** We have already rejected PDT's argument that violations may not be counted on a parameter by parameter basis. *See supra* note 22. To the extent PDT argues that the SOU defense of 33 U.S.C. § 1319(d) precludes such "double counting," we have already concluded that the defense is not available to PDT.

this case. PDT's argument on this point is without merit.[29]

For the foregoing reasons, we conclude that the district court did not err by granting summary judgment against PDT.

## V. Calculation of Civil Penalties

The Act sets forth several factors a district court must consider when imposing civil penalties. These factors are enumerated in section 309(d) of the Act:

> In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

33 U.S.C. § 1319(d).

After a bench trial on the issue of penalties, the district court assessed the maximum penalty for each of PDT's violations. The court then reduced the total by $1,000,-000 because the EPA and NJDEP failed to diligently prosecute PDT. PDT argues that the district court's factual findings on the seriousness of the violations and the economic benefit of noncompliance to PDT were clearly erroneous. PIRG argues that the district court erred as a matter of law by reducing the penalty because of the nonfeasance of governmental agencies. We will consider each contention in turn.

### A. *Factual Finding on Seriousness of the Violations*

▇ In considering the seriousness of PDT's violations, the district court stressed that there were a very large number of

violations and that many violations exceeded the permit limits by 100 to 1000 percent. *PIRG II*, 720 F.Supp. at 1161, 1163. The court also noted that at least ten violations involved toxic substances and many others involved pollutants known to harm marine life. Based on these factors, the court concluded that PDT's "386 violations were very serious in nature." *PIRG II*, 720 F.Supp. at 1163.

PDT argues that the district court's factual finding of seriousness was clearly erroneous. "Under the clearly erroneous standard, a finding of fact may be reversed only if it is completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." *American Home Products Corp. v. Barr Laboratories, Inc.*, 834 F.2d 368, 370–71 (3d Cir. 1987).[30] Despite this extremely limited standard of review, PDT contends that the district court's finding is erroneous because there was no particularized showing of the harm PDT's effluent caused in the Kill Van Kull.

The district court's finding is amply supported by the record. PDT's argument that its discharges did not seriously harm the Kill Van Kull is contradicted by EPA and NJDEP documents detailing the environmental harm caused by each pollutant PDT discharged. The district court properly relied upon these reports, *PIRG II*, 720 F.Supp. at 1161–62, and the large number of gross exceedances in concluding that PDT's violations were serious.

### B. *Factual Finding on Economic Benefit*

▇ PIRG offered several theories for calculating how PDT profited by not complying with the Act; all based on the argu-

---

**29.** There is, however, the interesting question of whether the district court *undercounted* the number of violations in this case. The Eleventh Circuit has interpreted the language of section 1319(d) as requiring that an exceedance of a thirty day average limit be counted as *thirty* violations. *Atlantic States Legal Found. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1139–40 (11th Cir. 1990). We do not consider whether the district court in this case erred by counting an exceedance of the thirty day limit as one violation,

since PIRG expressly waived this argument at oral argument. Transcript of Oral Arg. at p. 56.

**30.** PDT attempts to avoid this deferential standard of review by asserting that plenary review is appropriate where the district court's determination was based on documentary evidence. Appellant's Brief at p. 44. Since Fed.R.Civ.P. 52(a) was amended in 1985 to include findings based on documentary evidence, the outdated cases cited by PDT are inapposite.

ment that PDT could have hauled its waste-water off-site for treatment while it constructed a treatment facility. In considering the economic benefit to PDT, the district court concluded that PDT's benefit under any proposed theory was "far in excess of the statutory maximum [penalty]." *PIRG II*, 720 F.Supp. at 1163. PDT argues that this finding is clearly erroneous.

Precise economic benefit to a polluter may be difficult to prove. The Senate Report accompanying the 1987 amendment that added the economic benefit factor to section 309(d) recognized that a reasonable approximation of economic benefit is sufficient to meet plaintiff's burden for this factor.

Violators should not be able to obtain an economic benefit vis-a-vis their competitors due to their noncompliance with environmental laws. The determination of economic benefit or other factors will not require an elaborate or burdensome evidentiary showing. *Reasonable approximations of economic benefit will suffice.*

S.Rep. No. 50, 99th Cong., 1st Sess. 25 (1985) (emphasis supplied).

In determining economic benefit, the district court found as a matter of fact that facilities for off-site treatment of PDT's wastewater did not exist prior to 1982. Relying on the testimony of PDT's expert, Leroy Sullivan, the district court found that from 1982 until 1987 PDT could have hauled its wastewater to a DuPont facility in South Jersey for treatment. The district court calculated economic benefit by relying on a 1985 letter from Sullivan to Ronald Sprague, corporate secretary of PDT, detailing the possibility of hauling wastewater to DuPont at a cost of $0.11 to $0.12 per gallon. The district court used Sullivan's estimate of the wastewater discharged by PDT to calculate an economic benefit in excess of $4,205,000. *PIRG II*, 720 F.Supp. at 1162–63.

PDT, understandably upset by a penalty based on testimony of its own experts and corporate officers, argues that "plaintiffs cannot fairly use [the Sullivan] letter" to prove that off-site treatment was possible and therefore the district court's finding of economic benefit is clearly erroneous. To the contrary, we find that the district court properly used the Sullivan letter and the testimony of Sullivan at the bench trial. Indeed, the district court would have been remiss if it failed to consider these highly probative pieces of evidence. The district court's finding that the economic benefit to PDT exceeded the statutory maximum penalty of $4,205,000 is not clearly erroneous.

### C. Reduction of the Penalty Based on the Nonfeasance of the EPA and NJDEP

The district court reduced the total penalty in this case, stating:

With regard to defendant's "good faith" attempts to comply with the Act, the Court will adjust the statutory maximum downwards by $1,000,000.00 *because of the actions and/or non-actions taken on behalf of the United States Environmental Protection Agency and the New Jersey Department of Environmental Protection.* The Court finds that had they acted more diligently in making defendant comply, the violations in this case would have ceased long ago. Therefore, these two governmental bodies are partially to blame for the defendant's lack of compliance for the years at issue.

*PIRG II*, 720 F.Supp. at 1166–67 (emphasis supplied). PIRG and Intervenor EPA argue that the district court erred as a matter of law by using the nonfeasance of governmental bodies to support adjusting PDT's penalty. We exercise plenary review over this question of law.

PIRG and intervenor EPA claim that the district court erred by even considering the inaction of NJDEP and EPA. They point out that section 1319(d) specifically lists what a district court may consider when setting penalties and that the government's lack of diligence in prosecuting permit violators is not among those factors. PIRG and EPA ignore, however, the fact that the statute allows the district court to consider "such other matters as justice may re-

quire." 33 U.S.C. § 1319(d). We must consider whether the district court could properly consider the nonfeasance of the EPA and NJDEP under this factor.

 PIRG contends that, since government inaction is a prerequisite to a citizen suit under the Act, 33 U.S.C. § 1365(b)(1)(B) ("No action may be commenced ... if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action"), the district court should not reduce the penalty amount because of the EPA's and NJDEP's lack of diligence. We agree with PIRG that mere failure by governmental agencies to prosecute an NPDES permit holder does not allow a court to reduce a penalty. Nevertheless, there may be instances where the district court may consider a government agency's inaction and the permittee's reaction when setting civil penalties in a citizen suit. In a case where a defendant has failed in a good faith attempt to comply with its permit because of technical or economic problems and the EPA has affirmatively recognized and excused noncompliance, justice may require that a court adjust the penalty amount.

 In this case, we conclude that the district court did not find that justice required a reduction. The court made the penalty reduction "[w]ith regard to defendant's 'good faith.' " *PIRG II*, 720 F.Supp. at 1166. This directly contradicts the district court's earlier conclusion. The district court carefully reviewed the communication between PDT and EPA during the six year period involved in this suit and concluded that PDT's actions did not rise "to the level of 'good faith.' " and that "defendant, motivated possibly by greed or apathy, chose to procrastinate." *PIRG II*, 720 F.Supp. at 1165. In light of this finding, the district court's reduction of the penalty cannot be even impliedly based on the "as justice may require" factor.[31] Since PDT

did not make good faith efforts to comply with the Act, the district court erred by reducing the penalty because of the EPA's inaction. We will reverse the district court's order as to the amount of penalty and remand for recalculation of the penalty without the reduction.

## VI. The Trust Fund

 The district court determined that paying the civil penalties into the United States Treasury would not satisfy the purposes of the Act, and instead ordered that the penalties be paid into a trust fund. This trust fund would then be used "to directly impact environmental problems in New Jersey." *PIRG II*, 720 F.Supp. at 1168.

Neither party appealed this portion of the district court's order. We granted leave for EPA to intervene to contest this issue. EPA argues that all civil penalties assessed pursuant to the Act must be paid to the United States Treasury. PIRG counters that the district court could, in the exercise of its equitable jurisdiction, create a trust fund. Our review of this legal question is plenary.

The Act itself does not specify where the civil penalties are to be paid. The legislative history of the citizen suit provision, however, makes clear that Congress intended that the penalties be paid to the Treasury. "Any penalties imposed would be deposited as miscellaneous receipts and not be recovered by the complainant." S.Rep. No. 92–414, 92d Cong., 2d Sess. 133, *reprinted in* 1972 U.S.Code Cong. & Admin. News 3668, 3745. Congress intended that any penalties assessed in a citizen suit be treated as "miscellaneous receipts." Under the Miscellaneous Receipts Act, any person having custody of such public funds must deposit them in the Treasury within three days of receipt.[32] 31 U.S.C. § 3302(c)(1).

---

31. In addition, the correspondence between PDT and EPA would not support a finding that the EPA excused PDT's noncompliance. This correspondence at best indicates that EPA acquiesced in PDT's footdragging.

32. PIRG refers to other portions of the legislative history of the Act which suggest that monies paid in *settlement* of suits could be used to fund environmental projects. Of course a party may compromise its claim however it sees fit. *See United States v. Armour & Co.,* 402 U.S. 673,

Courts have consistently stated that penalties in citizen suits under the Act must be paid to the Treasury. *See e.g. Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 108 S.Ct. 376, 379, 98 L.Ed.2d 306 (1987) ("If the citizen prevails in such an action, the court may order injunctive relief and/or impose civil penalties payable to the United States Treasury"); *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 14 n. 25, 101 S.Ct. 2615, 2623 n. 25, 69 L.Ed.2d 435 (1981) ("Under the FWPCA, civil penalties, payable to the Government, also may be ordered by the court"); *Atlantic States Legal Found. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1131 n. 5 (11th Cir.1990) ("Penalties paid as a result of a § 1365 suit do not go to the plaintiff who instituted the suit, but rather are paid into the United States Treasury"); *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1113 (4th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989) ("the judicial relief of civil penalties, even if payable only to the United States Department of the Treasury, is causally connected to a citizen-plaintiff's injury"); *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir.1987) ("any penalties recovered from such an action are paid into the United States Treasury"); *see also Sierra Club Inc. v. Electronic Controls Design, Inc.*, 909 F.2d 1350 (9th Cir.1990).

Ordering that civil penalties be paid to the Treasury is entirely consistent with Congress' intent that citizen suits supplement the enforcement authority of the EPA. Directing that penalties be paid into the Treasury ensures that citizens bring suits to protect the public health and welfare, and not for private gain. *Middlesex County*, 453 U.S. at 18 n. 27, 101 S.Ct. at 2624 n. 27. PIRG nonetheless argues that the district court could have created this trust fund through its equitable jurisdiction when ordering injunctive relief. This is true and we do not reject PIRG's argument that in a Clean Water Act case, a court may fashion injunctive relief requiring a

681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). Once penalties are imposed, legislative history is

defendant to pay monies into a remedial fund, if there is a nexus between the harm and the remedy. But here, once the court labeled the money as civil penalties it could only be paid into the Treasury. Thus we will reverse that portion of the district court's order creating the trust fund and remand with instructions that the court order the penalties paid into the United States Treasury.

VII. The Permanent Injunction

As part of its final order, the district court entered the following permanent injunction:

> The defendant, Powell Duffryn Terminals, Inc. (P.D. Oil and Chemical Storage, Inc.), is hereby restrained and enjoined from making or causing any discharges into the Kill Van Kull from its waste water treatment plant in Bayonne, New Jersey that exceed any limitation and/or fail in any way to comply with the terms and conditions of the National Pollution Discharge Elimination System (NPDES) Permit issued to and effecting Powell Duffryn, including its present permit, NJ 003361, any and all additions and/or amendments and any and all permits that may hereafter be issued by any agency, state or federal, that is issued pursuant to the Clean Water Act, 33 U.S.C. § 1251, *et seq.*

*PIRG II*, 720 F.Supp. at 1169.

The district court entered this injunction after considering equitable principles as required by *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) and *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). A court may only enter a permanent injunction "after a showing of both irreparable injury and inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest." *Natural Resources Defense Council v. Texaco Refining and Marketing, Inc.*, 906 F.2d 934, 941 (3d Cir. 1990).

clear that the funds are to be paid into the Treasury.

PDT argues that the district court erred by entering the injunction because there was no evidence of irreparable harm. PDT states that the district court denied PIRG's earlier motion for a preliminary injunction because there was no evidence of irreparable harm, and that no further evidence of harm was produced by PIRG. Thus PDT concludes that the permanent injunction could not properly be entered. We review the district court's grant of permanent injunctive relief for abuse of discretion. *International Union v. Mack Trucks, Inc.,* 820 F.2d 91, 94–95 (3d Cir.1987).

In an unpublished opinion dated October 28, 1988, the district court denied PIRG's motion for a preliminary injunction because it was not convinced that irreparable harm was imminent. The court based this finding in part on the fact that PDT's DMRs demonstrated that its permit compliance had vastly improved. Nevertheless, since PDT had again violated its permit after the court denied PIRG's motion, the district court could properly conclude that an injunction was now appropriate. *E.P.G., University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct. 1830, 1833, 68 L.Ed.2d 175 (1981) (grant or denial of preliminary injunction not dispositive of later request for a permanent injunction). We conclude that the district court did not abuse its discretion by issuing this permanent injunction.

PDT also challenges the scope of the injunction. Fed.R.Civ.P. 65(d) requires injunctions to "be specific in terms" and to "describe in reasonable detail ... the act or acts sought to be restrained." PDT argues that the district court order is a broad "obey the law" injunction and should be vacated for lack of specificity.

■■■■ Overbroad language in an injunction that essentially orders a party to obey the law in the future may be struck from the order. *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.,* 824 F.2d 665, 669 (8th Cir.1987). Nonetheless, "the degree of particularity required of an injunction depends on the subject matter involved." *Calvin Klein,* 824 F.2d at 669

(citing *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.,* 685 F.2d 78, 83 (3d Cir.1982)).

Counsel for PIRG conceded at oral argument that the injunction in this case must be limited to the permit existing at the time of the action. Tran.Or.Arg. at 82. We will strike that portion of the injunction which purports to enjoin PDT from violating future permits. We do not find the portion of the injunction directing PDT not to discharge in violation of its current permit lacking in specificity. PDT's permit provides detailed and very specific limitations on PDT's discharge. Thus we will affirm the portion of the injunction prohibiting PDT from discharging in violation of its permit.

## VIII. Conclusion

For the foregoing reasons, we will reverse in part, affirm in part, and remand for further proceedings consistent with this opinion. Each party to bear its own costs.

ALDISERT, Circuit Judge, concurring.

I join in the opinion of the court and write separately only to express a nagging doubt about standing.

Throughout my extensive preparation of this case including close attention at argument and discussion with my colleagues at conference, I was persuaded that the member/plaintiffs had failed to show an actual injury that was traceable to the permit violations. I am now willing to join my colleagues' view. But I feel somewhat like Lord Byron's fair maiden in *Don Juan,* c 1, dedication cxvii,

A little more she strove, and much repented, And whispering "I will ne'er consent"—consented.

For the purposes of this case, I am willing to agree that the live bodies met the test. But barely. The standing case put in by the Public Interest Research Group (PIRG) and Friends of the Earth (FOE) is so skinny that I am concerned seriously our discussion will not survive careful Supreme Court review. I join in this opinion, therefore, with the shakiest of jurisprudential confidence. My intrepidity, questionable as it is, is the product of abject rationaliza-

tion: If the Supreme Court does not agree to review and reverse, then perhaps, if we are not absolutely correct, at least we are not totally wrong.

I.

By enacting the Federal Water Pollution Control Act (FWPCA), especially the provisions that authorize any "person or persons having an interest which is or may be adversely affected" to bring a suit "against any person ... who is alleged to be in violation of [a discharge permit]," Congress has expressed its enthusiastic support for the cleansing of our nation's waterways. 33 U.S.C. § 1365(g) and (a)(1). My concern is that this enthusiasm has led environmental organizations and citizen/plaintiffs to mistakenly believe they have standing to sue any time a discharge permit is violated. The Constitution and decisions of the Supreme Court and this court clearly demonstrate this is not the case. Even where statutory standing has been established, the test of constitutional standing must still be met.

I have been extremely troubled because I have a strong desire to affirm the district court judgment. I am convinced that Powell Duffryn Terminals, Inc. was a deliberate polluter and deserved appropriate penalties for many acts in violation of the conditions of its discharge permit. I find standing here only on the most questionable of grounds—a belief that somehow the Supreme Court might be inclined to relax its stringent requirements of standing in environmental cases.

On June 27, 1990, however, the Court did not assuage my concern in handing down its decision in *Lujan v. National Wildlife Federation,* —— U.S. ——, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). I am quick to recognize that *Lujan* is not precise precedential authority, but it does nevertheless constitute a direction that the Court desires us to travel in environmental law cases. In *Lujan* the Court faced a question of statutory, as distinguished from constitutional, standing. Moreover, the Court construed the Federal Land Policy and Management Act of 1976, the National Environmental

Policy Act of 1969 and the Administrative Procedure Act, and not the FWPCA. Yet, the Court's action sent a strong signal to all of us: It was not, repeat not, totally relaxing its standing requirements in cases affecting the environment.

The Court held that the affidavits of the National Wildlife Federation member/plaintiffs were factually insufficient to confer standing to challenge a decision of the Bureau of Land Management. It determined that because of the lack of specificity in the affidavits of its members, the National Wildlife Federation had failed to establish that the interests of the two member/plaintiffs were affected by the bureau's actions.

The Court insisted that affidavits of the member/plaintiffs show that the "injury [the affiant] complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provisions whose violation forms the legal bases for his complaint." *Id.* at ——, 110 S.Ct. at 3180. The Court directed us not to "assume[ ] that general averments embrace the 'specific facts' needed to sustain" standing. *Id.* at ——, 110 S.Ct. at 3182. If such are the Court's requirements to prove standing under a statute, it follows, *a fortiori*, that the Court requires some stringency in meeting Article III standing, the issue before us here. Nevertheless, I still am inclined to find standing. Perhaps my wish to find standing is father to the thought, but in view of *Lujan*, I hope it is not, as John Greenleaf Whittier put it, a "wish that failed of act."

I see PIRG and FOE in the position of the old-time vaudeville performer's ad in *Variety:* "Have tux, will travel." PIRG and FOE advertised: "Have case, need live-bodied members/plaintiffs." The questions for this court are: Were the recruited live bodies sufficiently injured to sustain this action, or more specifically, was theirs an "injury [that] fairly can be traced to the challenged action," or otherwise stated, did they "show injury in fact resulting from the action which they seek to have the court adjudicate?" *Valley Forge Chris-*

*tian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 473, 102 S.Ct. 752, 758, 759, 70 L.Ed.2d 700 (1982).

Maybe the wrong plaintiffs were recruited. Or, perhaps the plaintiffs were not sufficiently coached before their depositions. Whatever the case, constitutional standing is a serious question here.

## II.

There is no doubt that standing can be based on environmental, aesthetic and non-economic injury. *Sierra Club v. Morton,* 405 U.S. 727, 738, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). The more important question, however, is whether the individuals recruited by PIRG and FOE alleged injuries sufficient to sustain standing to bring this case.

The doctrine of standing limits the court's power to adjudicate conflicts pursuant to the "case or controversy" requirement of Article III of the Constitution. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). It was plaintiffs' burden, which cannot be waived, to establish standing as a threshold matter. *Id.* Citizen suits under the FWPCA are expressly subject to this standing requirement. *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). Even when Congress has acted to confer standing to litigate a statutory claim, "the requirements of Article III remain: 'the plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.'" *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41 n. 22, 96 S.Ct. 1917, 1926 n. 22, 48 L.Ed.2d 450 (1976) (quoting *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1973)).

The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). As refined by subsequent reformulation, this requirement of a "personal stake" has come to be understood to require a plaintiff to:

[1] "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,"

... and [2] that the injury "fairly can be traced to the challenged action" and [3] "is likely to be redressed by a favorable decision."

*Valley Forge,* 454 U.S. at 471, 102 S.Ct. at 758 (citations omitted).

I am even willing to concede that plaintiffs in this case have established an injury-in-fact that is redressable. My concern is with the second tier of the standing analysis mandated by *Valley Forge, supra.* We must decide if there is sufficient immediacy and reality to the allegations such that the injury alleged can be "fairly traced" to Powell Duffryn. To do this we must apply these constitutional standards to the findings of the district court.

## III.

What makes this case so difficult is that Powell Duffryn Terminals, Inc. is an egregious wrongdoer. A persuasive argument can be made that, as a business decision, it deliberately chose to exceed the discharges allowed under the permit because, from a financial standpoint, normal profits from its operations were such as to offset any financial penalty imposed from violating terms of its permit.

The district court held that from September 1977 through November 1988, Powell Duffryn committed 386 violations involving 11 pollutants of the effluent limitations in its National Pollutant Discharge Elimination System permits:

| Parameter | Number of Violations |
|---|---|
| Total Organic Carbon (TOC) | 8 |
| pH | 63 |
| Total Suspended Solids (TSS) | 66 |
| Bioassay | 1 |

| Parameter | Number of Violations |
|---|---|
| Oil and Grease | 48 |
| Hexavalent Chromium | 2 |
| Petroleum Hydrocarbons | 27 |
| Methylene Chloride | 9 |
| Phenol | 1 |
| Biochemical Oxygen Demand (BOD) | 80 |
| Chemical Oxygen Demand (COD) | 81 |
| TOTAL | 386 |

*PIRG v. Powell Duffryn Terminals*, 720 F.Supp. 1158, 1160–61 (1989). Many of its violations exceeded the effluent limitations in its permit by great amounts. Of the 386 violations, 260 exceeded the applicable permit limitation by over 100 percent and 86 violations exceeded the limits by more than 1,000 percent. A–19, A–3824 to A–3834. Powell Duffryn's violations involved toxic pollutants and pollutants which EPA has determined to be harmful to aquatic life.

If the receiving waters of Powell–Duffryn's discharge were crystal clear waters of a sylvan lake or an uncontaminated mountain stream, it would be easy to relate the alleged injury sustained by the member/plaintiffs to the company's discharge. But, the Kill is not the river once so eloquently described by Justice Douglas:

> The river, for example, is the living symbol of all the life it sustains or nourishes —fish, aquatic insects, water ouzels, otter, fisher, deer, elk, bear, and all other animals, including man, who are dependent on it or who enjoy it for its sight, its sound, or its life. The river as plaintiff speaks for the ecological unit of life that is part of it. Those people who have a meaningful relation to that body of water—whether it be a fisherman, a canoeist, a zoologist, or a logger—must be able to speak for the values which the river represents and which are threatened with destruction.

*Morton*, 405 U.S. at 743, 92 S.Ct. at 1370 (Douglas, J., dissenting). And complainants do not allege an injury like that once described by Justice Holmes:

> The nuisance set forth in the bill was one which would be of international importance,—a visible change of a great river from a pure stream into a polluted and poisoned ditch.

*Missouri v. Illinois*, 200 U.S. 496, 518, 26 S.Ct. 268, 269, 50 L.Ed. 572 (1906). The brute fact is that Powell Duffryn illegally discharged pollutants into the Kill Van Kull, one of the most industrialized waterways in the United States, if not the world.

The Kill lies between Staten Island, New York and the northern shore of New Jersey. It is part of the very busy greater Port of New Jersey and New York Channel complex and it links Newark Bay, to the east, with Arthur Kill Channel to the west. The entire shore is industrialized with the exception of Kill Van Kull Park, located two miles to the west of the facility. On the shore are the Bayonne Sewage Treatment Plant and the Port Richmond Sewage Treatment Plant. These two plants discharge up to 60 million gallons of treated sewage per day on the Kill and are located within 200–300 yards of the park. A–621–622, 121.

The Kill lost its pristine beauty many years ago. It is not the same body of water that greeted Hendrick Hudson and Peter Stuyvesant. Recent history best describes the state of the Kill today. During the period between submission of this case and the writing of these opinions the Kill has been the site of repeated gigantic oil spills from the many tankers that ply its waters. For example, on June 7, a British flag oil tanker ran aground while docking in the New Jersey side of the Kill Van Kull in New York Harbor, spilling 260,000 gallons of fuel oil into the waterway. *New York Times*, June 8, 1990, at A1, col. 5.

> In was the fifth major oil spill in the area since January.... The recent rash of spills in Kill Van Kull and connecting Arthur Kill has brought harsh criticism of the oil industry from environmentalists and state officials. The waterways separate New Jersey from New York's Staten Island, and are along industrialized areas.

*Los Angeles Times*, June 8, 1990, at A3, col. 1.

What we have here is an acknowledged egregious polluter discharging into an already polluted industrial waterway located in a severely threatened ecosystem.

Against this backdrop we must decide whether the pollution complained of by PIRG's and FOE's member/plaintiffs can be traced to the pollution discharged by Powell Duffryn.

## IV.

At best, the testimony of PIRG's and FOE's member/plaintiffs constitutes only a gossamer case of standing. The member/plaintiffs may have been injured, but there is very shaky proof that the stated injuries were traceable to *this* polluter.

## A.

Cheryl Cummings, whose family home in Bayonne, New Jersey, is one block from the Kill Van Kull, has used Kill Van Kull Park for biking and jogging for 19 years. Ms. Cummings testified that the pollution of the Kill Van Kull has diminished her enjoyment of the Park. She described the water of the Kill Van Kull as having "a film" which is "sometimes like a rainbow or sometimes like greenish-yellow." A–483, 253. "The park is often not a pleasant place to be." A–483, 2423. *Student Public Interest Research Group of New Jersey v. P.D. Oil & Chemical Storage, Inc.*, 627 F.Supp. 1074, 1085 (D.C.N.J., 1986) [hereinafter D.Ct. Op. I]. However, when Ms. Cummings was deposed by counsel for Powell Duffryn, she admitted:

Q. [By Mr. Edelstein] To you personally then the outcome of this lawsuit won't affect your use of the park, right?

A. [By Ms. Cummings] Correct.

In fact, she further testified that she had never read the allegations of the complaint and—

Q. [By Mr. Edelstein] If you had been read paragraph #7 by any representative of Terris & Sunderland, would you have authorized them to use you as a person on whom they could rely for standing?

A. [By Ms. Cummings] No.

A.–257. The testimony continues:

Q. [By Mr. Edelstein] If ... it was important that the allegations of Paragraph #7 have to be correct as to you, would you object to participating in this lawsuit?

A. [By Ms. Cummings] Yes.

A–259. Ms. Cummings in further testimony stated,

Q. [By Mr. Edelstein] Did Barbara [plaintiffs' paralegal] explain to you that the allegations in this suit were that there was a direct adverse effect on your aesthetic, environmental, economic, recreational activities due to Powell Duffryn's discharge?

A. [By Ms. Cummings] No.

Q. If [the allegations in the suit] had been explained to you, would you have been able to join in this suit?

A. No.

Q. Would you have been able to sign the affidavit?

A. No.

A–248 to A–249.

## B.

Sheldon Abrams, a member of Friends of the Earth, has noticed that the shores of the Kill Van Kull "are black and there is an oily sheen on the water" during his regular drives there. A–483, 2425. Mr. Abrams boats in Lower New York Bay, into which the Kill Van Kull flows. He stated that he would enjoy boating in New York Bay more if the water flowing into it from the Kill Van Kull were cleaner, and that he would boat and fish in the Kill Van Kull itself if it were cleaner. D.Ct.Op. 1 at 1085–86.

Again the testimony at the deposition indicates less facts supporting standing than was found by the district court. Mr. Abrams testified that he does not own property in the vicinity of the Kill Van Kull, Upper New York Bay or Lower New York Bay and that:

Q. [By Mr. Edelstein] You don't engage in any activities along the Kill Van Kull, do you?

A. [By Mr. Abrams] No.

Mr. Abrams occasionally fishes approximately ten miles south of the Powell Duffryn site. He further testified that his

alleged interest was "very generalized" and that,

> Q. [By Mr. Edelstein] You can answer this specifically. Do you have any facts on which to base a personal claim that you as an individual ... have been, are being, and will be adversely affected by this defendant's discharge?
>
> A. [By Mr. Abrams] I have no personal claim.

A-286 to A-287.

### C.

Andrew Gerbino, also a Friends of the Earth member, lives on the Staten Island side of the Kill Van Kull. He believes that the pollution of the Kill Van Kull and Lower New York Bay has decreased the value of his home. A-484, 2427.

Mr. Gerbino used to walk along the Staten Island side of the Kill Van Kull, but he no longer does because it is so polluted. Mr. Gerbino also stated that he can no longer eat any crabs or clams caught in the area, although in the past "all these waters used to be used for lobster catching, clamming, and crab catching. You don't see anyone doing that anymore." D.Ct.Op. I at 1086.

Mr. Gerbino testified that occasionally he drives over the Bayonne Bridge approximately two miles west of Powell Duffryn Terminals. His only recreational activities are south of South Beach, New York, approximately thirteen miles from Powell Duffryn and the Kill Van Kull, and thus unaffected by its discharge. He agreed that his generalized assertion in this case is actually that only, "any discharge from anywhere that finds its way to Lower New York Bay adversely affects [him]...." A-323.

### D.

Melissa Ven Ditti testified that she has never used the Kill Van Kull for recreational purposes. A-395. Her only involvement is that she occasionally walks at the Kill Van Kull Park, four blocks from her family home, at a location that is approximately 1.8 miles to the west of Powell Duffryn, and there is no access from the park to the Kill. The only environmental concern affecting her use of the park is a smell. She stated that "the water in the Kill Van Kull looks polluted and greasy. It has garbage floating in it and is brown. On some days it smells. If the water were not polluted, I would swim in it." A-2431. Powell Duffryn does not cause the smell, A-2018 to A-2020, and there is no allegation or evidence that it dumped garbage in the water.

When Ms. Ven Ditti was asked by defendant, "[A]re you claiming that you have an interest which is being or will be adversely affected by this defendant's discharge," her answer was "No." A-426.

### E.

Douglas MacNeil said that his activities were birdwatching at the park about five times a year, almost two miles from Powell Duffryn. His major complaint:

> As a birdwatcher, which is my main recreational activity in this area, if the waters are a certain quality, there will be more or less wildlife. If there's more, than it's better for me.
>
> Besides that, if the waters are unappealing to me as an individual, it will inhibit me from using the area for birdwatching. In fact, it does. I don't come here as often as I might if I felt the water was better.

A-357.

He further testified, however, that he possessed no facts indicating that Powell Duffryn's discharge adversely affected him, and that "no one said that its discharge directly [injures him] and I don't assert it." A-347 to A-348.

### V.

What troubles me from the testimony is any indication that the injury-in-fact was fairly traceable. Each member/plaintiff complained of pollution in general. There was very little, if any, attempt to link the injuries alleged to the pollution caused by Powell Duffryn. Even if I concede that

the individual plaintiffs were injured by the pollution in the Kill, no individual plaintiff was able to say that in this highly polluted waterway, the specific condition that was the object of his or her complaint was caused by Powell Duffryn.

The two sewage treatment plants' daily run-off consisted of 60 million gallons of treated sewage. The oil spills, the chemical processing facilities and the heavy ocean traffic have all contributed to this pollution. Yet, we as a court are faced with a lone defendant.

I believe that the foregoing is a fair summary of the evidence of the injuries and the "injury in fact resulting from the action they seek to have the court adjudicate." *Valley Forge*, 454 U.S. at 472–474, 102 S.Ct. at 757–59. Is it enough? I'm not sure. Were this not an environment case, it certainly would not be. I come down on the side of standing with stated qualms that are soothed somewhat by the notion that the evolving precepts of standing are perhaps expanded a bit when at stake are the great public policy considerations of insults to our environment.