INTERFAITH COMMUNITY ORGANI-
ZATION; Lawrence Baker; Martha
Webb Herring; Margaret Webb; Re-
verend Winston Clarke; Margarita
Navas; Hackensack Riverkeeper, Inc.,
consolidated plaintiff; William Shee-
han, consolidated plaintiff; Plaintiffs,

v.

HONEYWELL INTERNATIONAL,
INC.; W.R. Grace & Company;
ECARG, Inc.; W.R. Grace, Ltd.;
Roned Realty of Jersey City, Inc.;
Roned Realty of Union City, Inc.; De-
fendants.

Civil Action No. 95–2097 (DMC).

United States District Court,
D. New Jersey.

March 12, 2002.

Edward Lloyd, South Orange, NJ, for Plaintiffs.

William F. Mueller, Clemente, Mueller & Tobia, P.A., Morristown, NJ, John Michael Agnello, Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, Roseland, NJ, David W. Field, Lowenstein, Sandler, PC, Roseland, NJ, for Defendants.

## OPINION

CAVANAUGH, District Judge.

This matter is an environmental cause of action involving numerous motions by all parties. In this Opinion, the Court shall address three motions addressing section 7002, 42 U.S.C. § 6972 of the Resource Recovery Conservation Act ("RCRA"). The first motion is by Defendant Honeywell International, Inc. (formerly "AlliedSignal, Inc.") ("Honeywell") to dismiss Plaintiffs' RCRA count in the Amended Complaint for lack of standing. Second, Plaintiffs' Interfaith Community Organization ("Interfaith"), Lawrence Baker, Martha Webb Herring, Margaret Webb, Reverend Winston Clarke and Margarita Navas have cross-moved for partial summary judgment on this same count, seeking to have the Court decide, as a matter of law, that Plaintiffs have standing under RCRA to bring this citizen suit. Third, Defendants W.R. Grace & Company, Ecarg, Inc., and W.R. Grace, Ltd. (collectively "the Grace Defendants") along with Plaintiff Interfaith have moved jointly for partial summary judgment against

Honeywell on Plaintiff's RCRA claim, seeking to have this Court conclude, as a matter of law, that not only do Plaintiffs have standing, but that no genuine issues of material fact exist as to Honeywell's liability under RCRA.[1] Having decided to address these motions together, the Court's Opinion will first focus on the issue of standing and then turn to whether partial summary judgment is warranted against Honeywell with regard to Plaintiffs' RCRA claim.

The Court, having meticulously reviewed the submissions of all parties regarding the three motions described above, and for the reasons stated in this Opinion, holds that Defendant Honeywell's motion to dismiss for lack of standing is **denied.** Further, Plaintiff Interfaith's motion for partial summary judgment on the issue of standing to bring a citizen suit under RCRA is **granted.** Lastly, the joint motion by Interfaith and the Grace Defendants seeking to establish Honeywell's liability under RCRA as a matter of law is **denied.**

## BACKGROUND

The Court's "Background" section adopts a substantial portion of the facts stated in a prior opinion in this case insofar as they remain accurate. *See Interfaith Community Organization v. Allied-Signal, Inc.,* 928 F.Supp. 1339 (D.N.J. 1996).

### The Parties

This is an action brought by Plaintiffs Interfaith Community Organization ("Interfaith"), Lawrence Baker ("Baker"), Martha Webb Herring ("Herring"), Margaret Webb ("Webb"), Reverend Winston Clarke ("Clarke") and Margarita Navas ("Navas") (collectively the "Plaintiffs") against Defendants Honeywell International, Inc. ("Honeywell"), Roned Realty of Jersey City, Inc. and Roned Realty of Union City, Inc. (together "Roned") and W.R. Grace & Co. ("Grace USA"), ECARG, Inc. ("ECARG") and W.R. Grace, Ltd. ("Grace England") (together "Grace Companies") (collectively the "Defendants") seeking declaratory and injunctive relief mandating the cleanup of environmental contamination at the Roosevelt Drive In site in Jersey City, New Jersey (the "Site").

Interfaith is a not-for-profit corporation incorporated under the laws of the State of New Jersey. Amended Complaint, ¶ 19. Interfaith alleges its interest in chromium contamination in Hudson County and at the Site arose from its (1) inability to locate non-chromium contaminated land in Hudson County upon which it could construct 600 units of affordable single-family housing and (2) the discovery that member churches were built on land contaminated with chromium. *Id.,* ¶¶ 20–21; Affidavit of Reverend Geoffrey Curtiss ("Curtiss Aff."), ¶¶ 4–5. Members of Interfaith reside and work in the vicinity of the Site, frequently drive by the Site and sometimes shop in stores near the Site. Amended Complaint, ¶ 23. The remaining Plaintiffs described below are all members of Interfaith.

Baker is a member of the Monumental Baptist Church, a member church of Interfaith, and lives approximately two miles from the Site. *Id.,* ¶ 26; Affidavit of Lawrence Baker ("Baker Aff."), ¶ 1. From March 1973 through May 1990, Baker

---

1. The Court recognizes that Defendants Roned Realty of Jersey City, Inc. and Roned Realty of Union City, Inc. (collectively "the Roned Defendants") have made a motion for summary judgment as to all claims and cross-

claims asserted against them, which includes Plaintiff Interfaith's claim under RCRA. However, the Court does not address the Roned Defendants motion in this Opinion.

worked approximately one-half mile from the Site. Amended Complaint, ¶ 26; Baker Aff., ¶ 7. From the summer of 1991 through mid–1993, Baker worked as a security guard on property adjoining the Site. Amended Complaint, ¶ 26; Baker Aff., ¶ 2. During this period, Baker alleges that he observed "a greenish/yellowish ooze" on the site, usually after rainfall. Amended Complaint, ¶ 26; Baker Aff., ¶ 3. Mr. Baker's employment requires him to use the Jersey City Authority gas pumps adjacent to the Site once or twice a month. Amended Complaint, ¶ 26. Baker considers the Site a "blight on the neighborhood." *Id.*, ¶ 27.

Herring and Webb are members of the Monumental Baptist Church that claim to live within one-quarter mile of the Site. *Id.*, ¶¶ 28, 30. Herring and Webb have both worked and shopped in locations on or near the Site, such as the Pathmark supermarket located approximately one block from the Site and the Valley Fair store, a former retail establishment located on the Site. *Id.* Like Baker, Herring asserts the Site's present condition adversely affects her aesthetic interests. *Id.*, ¶¶ 29, 31.

Clarke is an individual member of Interfaith and lives less than one-quarter mile from the Site. *Id.*, ¶ 32. Clarke also claims to shop regularly at the Pathmark supermarket near the Site. *Id.* Clarke asserts that he has paid membership fees to Interfaith since 1994 and is concerned about the health risks associated with chromium near his home. Third Affidavit of Reverend Winston Clarke, ¶¶ 3, 7, 8. Clarke also has expressed a concern that the chromium contamination in Hudson County has had a negative impact on the value of his property. While Interfaith did not provide for individual membership until November 1999, Clarke has regularly participated in Interfaith meetings since 1994 and has since possessed voting authority within the organization. Curtiss Aff., ¶ 9.

In August 1991, Navas moved into a condominium located less than one-quarter mile from the Site. Amended Complaint, ¶ 34. Eight months later, in April 1992, Navas was diagnosed with sarcoidosis, a rare disease that affects the organs of the body and causes pain in the chest, back and joints. Affidavit of Margarita Navas ("Navas Aff."), ¶ 3. Navas is concerned that her condition may be caused or aggravated, at least in part, by the chromium waste near her home. *See id.*, ¶ 6; Amended Complaint, ¶ 34. Navas also alleges that her current exposure to the Site includes shopping at the Parkmark supermarket a few times a week. *Id.*, ¶ 35.

Honeywell, previously named AlliedSignal, Inc. ("AlliedSignal"), is incorporated under the laws of the State of Delaware. *Id.*, ¶ 38. Mutual Chemical Company of America ("Mutual"), a prior subsidiary of AlliedSignal, owned and operated a chromate chemical production facility across the street from the Site from approximately 1905 to 1954. *Id.* The Site was used during this time to dispose of chrome ore residue from the chromate plant. In 1954, Allied Chemical and Dye Corporation acquired Mutual and sold the Site to Amy Joy Realty Corporation for the construction of a drive-in movie theater. *Id.* In March 1955, Allied Chemical and Dye Corporation executed a merger agreement with Mutual and thereby agreed to exonerate, indemnify and hold Mutual harmless against all future liability. *Id.* A few years later, the merged company changed its name to the Allied Corporation and through a merger with Signal Companies, Inc. in 1985, became AlliedSignal, Inc. *Id.* AlliedSignal, Inc. and Honeywell, Inc. merged in the latter half of 1999 to become Honeywell International, Inc.

Grace–USA is a corporation formed under the laws of the State of Connecticut. *Id.*, ¶ 41. Grace–England is a direct subsidiary of Grace USA with a registered office in London, England. *Id.* ECARG is a New Jersey corporation and a subsidiary of W.R. Grace & Co. *Id.* Grace–USA and Grace–England were the sole stockholders of Grace Retail Corporation ("Grace Retail"), which acquired two parcels of land constituting the largest portion of the Site. *Id.*, ¶ 42. In November 1986, the Channel Acquisition Company ("Channel") acquired Grace Retail and pursuant to a letter agreement, Grace Retail was to distribute some of its assets, including its portion of the Site, to Grace USA and Grace England. *Id.*, ¶ 43. This transfer, however, never occurred. *Id.* Nevertheless, Grace USA and Grace England were unaware the transfer did not occur and acted as owners of the parcels until October 14, 1994. *Id.* On October 14, 1994, then-owner Channel conveyed the parcels to ECARG. *Id.*, ¶ 44.

Roned Realty of Jersey City and Roned Realty of Union City are corporations incorporated under the laws of the State of New Jersey. *Id.*, ¶ 45. The records of the Jersey City Assessor's Office list a Roned Realty Corp. as the owner of a subdivided parcel of the Site. *Id.*, ¶ 45. It is unclear if the owner is either Roned Realty of Jersey City or Roned Realty of Union City. *Id.*

*Chromium Contamination at the Site*

At present, the Site is 32.2 acres of paved land enclosed by a chain link fence. *See* Declaration of Michael Caffrey, Exhibit A. Mutual owned and operated a chromate chemical production facility (the "Facility") on West Side Avenue and Route 440 in Jersey City, New Jersey until 1954. *Id.* The Facility extracted chromium from chromium ores to produce chromate chemicals. *Id.*, ¶ 46. The process generated chromium-bearing waste that Mutual transported through a pipeline onto the Site. *Id.* In addition to the chromium-bearing waste, Mutual dumped unknown amounts of other refuse at the Site. *Id.* By December 5, 1953, waste at the Site was piled in an area covering approximately ten acres and measuring ten to thirty feet in height. *Id.*

The Site's groundwater flows toward the Hackensack River. *Id.*, ¶ 48. Plaintiffs assert that pollutants leach into the groundwater, are carried from the Site, and are discharged into the Hackensack River. *Id.* Drainage ditches lined with a polyvinyl chloride, a layer of another geotextile and gravel are located at the northern and southern edges of the Site leading to the Hackensack River. *Id.*, ¶ 47. Plaintiffs further allege that during high tide, water from the Hackensack River enters the drainage ditches and chromium is washed from the drainage ditches into the Hackensack River. *Id.*

*Potential Health Risks of Chromium*

The chromium found at the Site is primarily trivalent and hexavalent chromium. Both forms raise environmental and human health concerns, but hexavalent chromium is by far the more toxic form of chromium compound. Airborne chromium and chromium compounds are categorized as carcinogenic by Environmental Protection Agency ("EPA") standards, but other organizations, such as the National Toxicity Institute, consider all compounds containing chromium to have carcinogenic potential. *See* Risk Assessment for Chromium Sites in Hudson County, New Jersey, 3–16, 3–17 (April 1989), attached as Exhibit 45 to Plaintiff's Memorandum in Opposition to [Honeywell International, Inc.]'s Motion to Dismiss Plaintiff's Amended Complaint and in Support of Plaintiff's Cross Motion for Partial Summary Judgment on the Issue of Standing. Hexavalent chromium can

also cause non-carcinogenic ailments by penetrating human skin to cause or exacerbate allergic and irritative effects on the respiratory system, kidneys, and skin. *Id.* at 3–5, 3–19, 3–20, 3–22.

### NJDEP Administrative Consent Order

In 1983, Honeywell informed the New Jersey Department of Environmental Protection ("NJDEP") that the Site was contaminated with chromium-bearing waste. *Id.,* ¶ 61. In that same year, sampling and analysis was conducted at the Site by a contractor hired by the Grace Companies. *Id.,* ¶ 67. The Grace Companies have taken no further action with regard to the Site. *Id.* In 1987 and 1988, Roned completed an Interim Remedial Action on its portion of the Site, placing a one-foot soil cover and asphalt cover over parts of the Site. *Id.,* ¶ 69. Roned has not adopted additional measures to cleanup the portion of the Site it owns. *Id.*

On December 2, 1988, NJDEP issued a Directive entitled *In the Matter of the Hudson County Chromate Chemical Production Waste Sites and Allied Signal [sic] Inc.; PPG Industries Inc.; Occidental Chemical Corp.; and Maxus Energy Corp.* The Directive made numerous factual findings. AlliedSignal (presently Honeywell) was found to be a successor in interest to Mutual, who operated a plant that generated chromate chemical waste, some of which contained hexavalent chromium. *Id.,* ¶¶ 1, 4. The Directive also found that at the time AlliedSignal sold the Roosevelt Drive In Site in 1954, it possessed "specialized knowledge that the chromate chemical production waste might present environmental and public health risks." *Id.,* ¶ 12. AlliedSignal was further found to have taken no measures to prevent any potential harm from its waste production. *Id.,* ¶¶ 12, 16. Lastly, the ACO found that:

The [NJDEP] has determined that the uncontrolled discharges of hazardous substances from the chromate chemical production waste at the Sites ... are within an area of high population density in the State of New Jersey and that the risk of human exposure to chromate chemical production waste at the Site ... is ongoing. Chromium compounds contained in the chromate chemical production waste are toxic to humans and include demonstrated human carcinogens. These conditions create a substantial risk of imminent damage to public health and safety and imminent and severe damage to the environment.

*Id.,* ¶ 18.

The Directive ordered Honeywell (then AlliedSignal) to undertake interim remedial actions to remove, or arrange for the removal of, certain hazardous substances, namely chromium-bearing waste, from the Site and from other locations also contaminated with chromium waste. *Id.,* ¶ 12.

Honeywell contends that it has performed Interim Remedial Measures ("IRM") at the Site pursuant to the Directive. The Directive ordered Honeywell to undertake IRMs at several locations where Mutual's waste had allegedly been deposited, including the Site. The Directive provided that Honeywell "shall" submit an interim remedial work plan, and upon receipt of NJDEP approval, "immediately" commence implementation of IRMs designed to prevent the further discharge of chromium-bearing waste. *Id.,* ¶ 31, 33.

Pursuant to the Directive, Honeywell conducted an IRM at the Site by regrading a portion of the Site and placing a polyvinyl chloride cover over the regraded portion. Amended Complaint, ¶ 61. Thereafter, as part of the IRM and under NJDEP supervision, Honeywell installed a new bulkhead over the existing bulkhead along the Hackensack River. *Id.,* ¶ 61.

When the initial polyvinyl chloride cover was damaged by high winds, Honeywell repaired and reinforced the cover. *Id.,* ¶ 62.

On June 17, 1993, Honeywell entered into an Administrative Consent Order ("ACO") with NJDEP. *Id.,* ¶ 64. The ACO requires Honeywell to conduct a remedial investigation and feasibility study ("RI/FS") for eighteen locations, including the Site. *Id.* The ACO establishes a process for conducting a RI/FS at the Site and selecting an appropriate remedial action. *Id.,* ¶ 63. Pursuant to the ACO, Honeywell has committed $10 million to conduct the RI/FS and $50 million to remediate the eighteen locations referenced in the ACO, including the Site. *Id.* The ACO also provides that if the remediation cost for all eighteen locations exceeds this set amount, Honeywell shall implement a full remediation effort unless it disagrees with the appropriateness of the remedies selected. *Id.* Plaintiffs allege that Honeywell has not faithfully committed itself to the remediation of the Site. *Id.*

*Procedural History*

Plaintiffs filed a complaint (the "Complaint") on May 3, 1995. At a status conference held on July 27, 1995, Plaintiffs were granted leave to amend the Complaint. The Amended Complaint was filed on August 2, 1995.

In Count I of the Amended Complaint, Plaintiffs allege Defendants violated section 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), because the chromium-bearing waste present at the Site presents an imminent and substantial endangerment to health or the environment. Amended Complaint, ¶¶ 71–74. The remaining counts of Plaintiff's Amended Complaint have been dismissed. *See Interfaith Community Organization v. Al-liedSignal, Inc.,* 928 F.Supp. 1339, 1341, 1351, 1353 (D.N.J.1996).

At present, twelve motions are pending in this matter. This Opinion only addresses three of those twelve motions. The first, filed by Defendant Honeywell on June 6, 2000, is to dismiss Count One of Interfaith's Amended Complaint for lack of standing. The second motion, also filed on June 6, 2000, is a cross-motion by Plaintiff Interfaith for partial summary judgment on this same count. The final motion addressed in this Opinion is by the Grace Defendants and Plaintiff for partial summary judgment as to Honeywell's liability on Plaintiffs' RCRA claim. This motion was filed on August 2, 2001.

## DISCUSSION

### I. Defendant Honeywell's motion and Plaintiff Interfaith's cross-motion as to standing to bring a citizen suit under RCRA.

#### A. RCRA and the right to bring a citizen suit.

Beginning in the late 1970's and through the present day, considerable attention has been focused on the harmful effects of hazardous waste. *See* 1 S. Cooke, The Law of Hazardous Waste, § 1.01 at 1–2 (2001). This increased public awareness led to the passage of numerous federal and state statutory schemes intended to "control the management of hazardous waste and to accelerate the cleanup of disposal sites containing these wastes." *Id.* One of the more comprehensive federal environmental statutes is the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.,* which was enacted in 1976 to provide a "multifaceted approach toward solving the problems associated" with improperly disposed hazardous waste. *Id.,* § 1.05[1] at 1–5 (*citing* H.R.Rep. No. 1491, 94th Cong., 2d. Sess., pt. 1, at 2 (1976),

*reprinted in* 1976 U.S.Code Cong. & Admin. News 6238, 6239). RCRA is primarily targeted at reducing "the generation of hazardous waste and ... ensur[ing] the proper treatment, storage and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.' " *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) (*citing* 42 U.S.C. § 6902(b)).

Aside from the authority RCRA provides federal and state authorities to enforce its mandates, section 7002(a) of RCRA also creates a private right of action for individuals to bring citizen suits, permitting private citizens to enforce RCRA's directives.[2] Through the citizen suit, private individuals and entities, like Plaintiffs, can act as "private attorneys general" or "citizen watchdogs" to monitor enforcement and compliance with mandatory cleanup duties. 3 S. Cooke, The Law of Hazardous Waste, § 16.03[1] at 16–83 (2001).

Generally, RCRA provides for three distinct types of citizen suits. First, Section 7002(a)(1)(A) authorizes citizen suits against any person or entity who is in violation of "any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant" to RCRA. 42 U.S.C. § 6972(a)(1)(A). Second, Section 7002(a)(2) of RCRA permits any person to commence an action against the Administrator of the Environmental Protection Agency ("EPA") for a failure by the EPA "to perform any [nondiscretionary] act or duty" under RCRA. 42 U.S.C. § 6972(a)(2). Lastly, Section

**2.** The full text of section 7002(a) of RCRA, 42 U.S.C. § 6972(a) (West 1995, Supplement 2001), reads:

(a) In general
Except as provided in subsection (b) or © of this section, any person may commence a civil action on his own behalf—(1)(A) against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or (B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment; or (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.
Any action under paragraph (a)(1) of this subsection shall be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur. Any action brought under paragraph (a)(2) of this subsection may be brought in the district court for the district in which the alleged violation occurred or in the District Court of the District of Columbia. The district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce the permit, standard, regulation, condition, requirement, prohibition, or order, referred to in paragraph (1)(A), to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both, or to order the Administrator to perform the act or duty referred to in paragraph (2), as the case may be, and to apply any appropriate civil penalties under section 6928(a) and (g) of this title.

7002(a)(1)(B), as amended in 1984, permits a civil suit against any person or entity "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present in imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B); *Meghrig*, 516 U.S. at 484, 116 S.Ct. 1251. It is this final type of citizen suit that is at issue in this Opinion.

## B. Standing In General.

■ Standing is not merely a pretrial formality, but rather a constitutional directive that defines and limits the power of federal courts to hear only actual "cases" or "controversies." *See* U.S. CONST., ART. III, § 2, cl. 1. "The constitutional power of federal courts cannot be defined, and indeed has no substance, without reference to the necessity to adjudge the legal rights of litigants in actual controversies." *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (*quoting Liverpool S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899 (1885)). As such, the Supreme Court has repeatedly stated that:

> [A]t an irreducible minimum, Article III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision.

*Valley Forge Christian College*, 454 U.S. at 472, 102 S.Ct. 752 (internal citations and quotation marks omitted). In short, standing requires injury-in-fact, causation and redressability. *Steel Company v. Citi-*

*zens for a Better Environment*, 523 U.S. 83, 103–04, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

■ The injury-in-fact requirement for standing requires that a plaintiff allege a "distinct and palpable" injury. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). The injury must be "real, earnest and vital," *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345, 12 S.Ct. 400, 36 L.Ed. 176 (1892), rather than merely abstract, conjectural or hypothetical. *See Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). The injury does not have to be substantial; "an 'identifiable trifle' will suffice." *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 71 (1990) (hereinafter *"Powell Duffryn"*) (*quoting United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)). For example, an injury that harms the aesthetic and recreational interests of a plaintiff has been held to constitute a sufficient injury-in-fact to support standing. *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). In another instance, the Court of Appeals for the Second Circuit has held that an affidavit stating that an environmental group member had driven over a polluted body of water and was offended at its appearance stated a sufficient injury to justify standing. *See Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 61 (2d Cir.1985).

■ A plaintiff is not required to show causation with "absolute scientific rigor." *Powell Duffryn*, 913 F.2d at 72. Rather, a defendant's conduct need only be "fairly traceable" to the alleged injury to the plaintiff. *Id.; Whitmore*, 495 U.S. at 155,

110 S.Ct. 1717 (*citing Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). This inquiry basically asks the following question; Is there a "substantial likelihood that defendants conduct caused plaintiff's harm[?]" *Powell Duffryn*, 913 F.2d at 72 (*citing Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978)).

■ A plaintiff must also demonstrate that a favorable decision will redress the alleged injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Whitmore*, 495 U.S. at 155, 110 S.Ct. 1717 (*citing Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). This inquiry focuses on whether the plaintiff will "benefit in a tangible way from the court's intervention." *Warth*, 422 U.S. at 508, 95 S.Ct. 2197. Said differently, the redressability prong "focuses on the connection between the plaintiff's injury and the judicial relief sought." *Powell Duffryn*, 913 F.2d at 73 (*citing Allen v. Wright*, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

■ Even allegations of possible future injury can justify standing. However, the threatened injury must be immediate and impending to satisfy the requirements of Art. III. *Whitmore*, 495 U.S. at 158, 110 S.Ct. 1717 (*citing Babbitt v. Farm Workers*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). In *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, an environmental group challenged the Interstate Commerce Commission's decision to apply a surcharge on railroad freight rates, claiming that ICC's action would:

> cause increased use of nonrecyclable goods as compared to recyclable goods, thus resulting in the need to use more natural resources to produce such goods, some of which resources might be taken from the Washington area, and resulting in more refuse that might be discarded in national parks in the Washington area.

*SCRAP*, 412 U.S. at 688, 93 S.Ct. 2405. The group members alleged that this would cause them to suffer "economic, recreational and aesthetic harm." *SCRAP*, 412 U.S. at 678, 93 S.Ct. 2405. The Supreme Court found standing in this case, observing that the SCRAP members stated "specific and perceptible harm sufficient to survive a motion to dismiss for lack of standing." *SCRAP*, 412 U.S. at 679, 93 S.Ct. 2405. While this holding has been characterized as the "outer limit of the law," it has not, to date, been overruled. *See Whitmore*, 495 U.S. at 159, 110 S.Ct. 1717.

### C. Associational Standing.

■ An association or organization's standing to initiate suit on behalf of its members exists "when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (*citing Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). An association can assert standing "[e]ven in the absence of injury to itself" as long as the individual members or individuals that possess the "indicia of membership" would individually have a justiciable case. *Warth*, 422 U.S. at 511, 95 S.Ct. 2197; *Hunt*, 432 U.S. at 343–44, 97 S.Ct. 2434.

**D. Analysis of whether Interfaith and its members have standing.**

■ The first inquiry in determining whether an association, such as Interfaith, has standing to sue on behalf of its members requires this Court to assess whether Interfaith members "would otherwise have standing to sue in their own right." *Friends of the Earth, Inc.*, 528 U.S. at 181, 120 S.Ct. 693. This requires the Court to ascertain if Plaintiffs have suffered an injury that is fairly traceable to Defendants' alleged conduct and capable of being fairly redressed by a favorable decision by this Court. *Valley Forge Christian College*, 454 U.S. at 472, 102 S.Ct. 752.

Contrary to Defendant Honeywell's proffered arguments, Interfaith has not merely asserted an "abstract question of wide public significance" or a "generalized grievance." *Valley Forge Christian College*, 454 U.S. at 475, 102 S.Ct. 752; *Flast v. Cohen*, 392 U.S. 83, 106, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Plaintiff's have asserted real and imminently threatening environmental concerns that affect their health, aesthetic, recreational and environmental interests. The Supreme Court has held that "aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." *Sierra Club*, 405 U.S. at 734, 92 S.Ct. 1361. Plaintiffs' assert that they are particularly affected by chromium contamination at the Site. While this presents a general concern for all residents in Hudson County, Plaintiffs' claim to be specifically affected by Defendant's alleged failure to fully remediate the Site. Case law favors Plaintiffs on this issue.

In *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, Plaintiffs were environmental groups that brought a citizen suit against Laidlaw Environmental Services (TOC), Inc. ("Laidlaw") alleging a failure to comply with a National Pollutant Discharge Elimination System permit obtained under the Clean Water Act, 33 U.S.C. 11341(a)(1), by permitting mercury to discharge into the North Tyger River in South Carolina. *Friends of the Earth, Inc.*, 528 U.S. at 175–76, 120 S.Ct. 693. Laidlaw argued that Plaintiffs lacked standing because the "organizations failed to show that any of their members had sustained or faced the threat of any injury in fact from Laidlaw's activities." *Id.* at 181, 120 S.Ct. 693.

In contrast, the Supreme Court noted a member of one of the plaintiff organizations, Kenneth Lee Curtis,

> averred ... that he lived a half-mile from Laidlaw's facility; that he occasionally drove over the North Tyger River, and that it looked and smelled polluted; and that he would like to fish, camp, swim and picnic in and near the river ... as he did when he was a teenager, but would not do so because he was concerned that the water was polluted by Laidlaw's discharges.

*Id.* at 181–82, 120 S.Ct. 693. Another member of the plaintiff organizations, Angela Patterson, described that she:

> [L]ived two miles from the facility; that before Laidlaw operated the facility, she picnicked, walked, birdwatched, and waded in and along the North Tyger River because of the natural beauty of the area; that she no longer engaged in these activities in or near the river because she was concerned about harmful effects from discharged pollutants; and that she and her husband would like to purchase a home near the river but did

not intend to do so, in part, because of Laidlaw's discharges. *Id.* at 182, 120 S.Ct. 693. Another member, Linda Moore, stated that she lived twenty miles away from the Laidlaw site and that she would like to use the North Tyger River and land near it for recreational purposes, but opts not to do so because of her concern about Laidlaw's discharges. *Id.* Another member, Norman Sharp, claimed that he regularly canoed about forty miles downstream from the Laidlaw facility and would like to canoe "closer to Laidlaw's discharge point, but did not do so because he was concerned that the water contained harmful pollutants." *Id.* at 183, 120 S.Ct. 693.

The Supreme Court found that these statements raised "reasonable concerns about the effects of [Laidlaw's] ... discharges" and that the affidavits described how Laidlaw's conduct "directly affected those affiants' recreational, aesthetic, and economic interests." *Id.* at 183–84, 120 S.Ct. 693. Justice Ginsburg further articulated that the mere fact that the group members made conditional statements did not render their affidavits speculative. *Id.* at 184, 120 S.Ct. 693. In fact, the seven justice majority saw,

> nothing improbable about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms.

*Id.* Based on this reasoning the Supreme Court held that plaintiffs' had standing to bring suit.

In *Public Interest Research Group of New Jersey, Inc. ("PIRG") v. Powell Duffryn Terminals Inc. ("Powell Duffryn")*, 913 F.2d 64 (1990), the Third Circuit also addressed a permit violation under the Clean Water Act. Powell Duffryn was ac-

cused of violating their permit 386 times over the course of a six-year period by allowing petroleum spillage to discharge into the Kill Van Kull, a navigable body of water near Bayonne, New Jersey. *Powell Duffryn*, 913 F.2d at 69–71. As in *Laidlaw*, members of the plaintiff organizations stated in affidavits that they reside, hike, jog, or bicycle near Kill Van Kull. In addition, they further stated that they would boat, fish or swim in Kill Van Kull if it were cleaner. *Id.* at 71. The Third Circuit found that these allegations satisfied the requirements of Article III standing. In so holding, the Court reiterated the Supreme Court's statement in *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)* that an "identifiable trifle" is sufficient to meet the injury-in-fact requirement and found that the injuries in this case were not trifles, but rather legitimate injuries to the aesthetic and recreational interests of PIRG and its members. *Id.*

As in *Laidlaw* and *Powell Duffryn*, Interfaith members have also asserted that they have suffered aesthetic, recreational and environmental injuries. Each of the individual plaintiffs in this suit, as well as other members not named in this action, resides near the Site. Interfaith members also visit businesses near the site or have visited businesses previously located on the Site. For example, Lawrence Baker lives less than two miles away from the Site and has worked near the Site for about fifty years. Baker Aff., ¶ 1. As of the filing of the present motion in June 2000, Baker still worked in the area. *Id.*, ¶ 10. Baker avers to witnessing a "greenish/yellowish ooze" on the site. *Id.*, ¶ 4. Baker further stated that the Site is "disgraceful" in appearance and a "blight to the neighborhood." *Id.*, ¶¶ 8, 12. Baker expresses a concern for his health in being exposed to the· Site. *Id.*, ¶ 11. In fact,

Baker was hospitalized prior to the filing of this motion for kidney failure. Third Affidavit of Lawrence Baker, ¶ 10.

Other members have also expressed concerns. Herring avers that she too lives near the Site and shops at the Pathmark supermarket near the Site. Second Affidavit of Martha Webb Herring ("Second Herring Aff."), ¶¶ 2, 5. She also fears for her health. Second Herring Aff., ¶ 8. Navas lives less than one-half of a mile from the Site. Navas Aff., ¶ 1. Navas avers that she is concerned about her health and the health of her family due to the chromium at the Site. Navas Aff., ¶ 6. Navas also claims that she occasionally walks and bicycles near the "unattractive" Site along the Hackensack River and would do so more often if the area were cleaner. *See id.,* ¶¶ 7–8. Navas was diagnosed with sarcoidosis shortly after moving into her residence near the Site in 1991. Sarcoidosis is a rare form of psoriasis that can be caused or exacerbated by the presence of irritative and allergic substances in her environment. Navas Aff., ¶ 3. While Navas did not state that she is specifically concerned about how the chromium at the Site affects her condition, she did express a general concern for her health, which may potentially be impacted upon by the presence of chromium near her home and in areas she frequents. Ms. Webb also fears for her health in light of her residential proximity to the Site. *See* Amended Complaint, ¶ 30.

Lastly, Clark states in an affidavit dated January 12, 2000 that he lives within one quarter mile of the Site and that he shops regularly at the Pathmark supermarket near the Site. Affidavit of Reverend Winston Clarke ("Clarke Aff."), ¶¶ 2–3. Clarke asserts that he worries about the effects of the Site's chromium contamination on his health. Clarke Aff., ¶ 5. He further states that he avoids the nearby river "because it is unpleasant to look at and I am afraid that it may be harmful to my health." Clarke Aff., ¶ 7.

The individual plaintiffs in this case, each members of Interfaith or individuals with sufficient indicia of membership to be treated as members by this Court, all have stated injuries similar to those found to suffice for standing in both *Laidlaw* and *Powell Duffryn.* The individual members of Interfaith live near the Site, consider the Site to be a blight on the neighborhood, and some have even expressed that contamination of the Site has curtailed their recreational and aesthetic interest in the Site. As far back as 1988, an NJDEP Directive found that the chromium contamination at the Site posed an ongoing risk to humans and created a "substantial risk of imminent damage to public health and safety and imminent and severe damage to the environment." *In the Matter of the Hudson County Chromate Chemical Production Waste Sites and Allied–Signal [sic] Inc.; PPG Industries Inc.; Occidental Chemical Corp.; and Maxus Energy Corp.,* ¶ 18. A prior Opinion in this matter by the Honorable Alfred J. Lechner, dated April 25, 1996, further found that:

> In the Amended Complaint, Plaintiffs allege "[t]he hazardous waste, including chromium-bearing waste, at the [Site], may present an imminent and substantial endangerment to health or the environment." Amended Complaint, ¶ 73. *Chromium-bearing waste has been and continues to be present at the Site. Id.,* ¶¶ *46, 61, 73. The Amended Complaint is based on actual and long-standing contamination which may be presenting a harm to human life and the environment.*

*Interfaith Community Organization v. AlliedSignal, Inc.,* 928 F.Supp. 1339, 1349 (D.N.J.1996) (emphasis added). In both 1988 and 1996, the Site was found to pose

a threat of continuous environmental harm. Plaintiffs allege that Defendants have failed to adequately contain this harm, even though Honeywell, through an administrative consent order, has agreed to do so. Given the allegations of Interfaith's members and the present contamination of the Site, this Court finds that Interfaith's members have presented sufficient facts to show that they are suffering an actual injury at the present time or have at least stated concerns of specific and perceptible future harm sufficient satisfy the injury-in-fact requirement of constitutional standing. *See SCRAP*, 412 U.S. at 679, 93 S.Ct. 2405.

■ The second standing requirement demands that Plaintiffs' demonstrate that Defendants' conduct (failure to conduct a full remediation effort at the Site) is fairly traceable to Plaintiffs' stated or threatened injuries. Each of the individual Plaintiffs have stated that they are concerned for their health in light of their proximity to the Site. Plaintiffs Navas and Baker have each suffered from conditions that could have been caused or may have been exacerbated by the presence of chromium in their environment. Furthermore, each of the individual Plaintiffs has claimed that the Site either has prevented or curtailed their recreational or aesthetic interest in the Site. These injuries are all fairly traceable to Honeywell's alleged failure to make the Site environmentally safe. *See Simon*, 426 U.S. at 38, 96 S.Ct. 1917.

■ The redressability prong of the test for standing can be dealt with in short order. If Plaintiffs earn a favorable decision from this Court, Honeywell would be required to conduct complete remediation efforts, which would resolve Plaintiffs' health, aesthetic and economic concerns. An adequate cleanup of the Site would also make a sufficiently large tract of land available for Interfaith's affordable housing proposal in Hudson County. These results would surely "benefit" Interfaith and its members "in a tangible way." *Warth*, 422 U.S. at 508, 95 S.Ct. 2197. Therefore, this Court finds that the redressability prong is also satisfied here. Accordingly, this Court finds that Interfaith members "would otherwise have standing to sue in their own right" and thus have satisfied the first prong of the test for associational standing. *See Friends of the Earth, Inc.*, 528 U.S. at 181, 120 S.Ct. 693.

■ Next, the Court must assess whether the interests at stake in this litigation are "germane" to Interfaith's organizational purpose. *Friends of the Earth, Inc.*, 528 U.S. at 181, 120 S.Ct. 693. According to the President of Interfaith, Geoffrey Curtiss, the purpose of Interfaith is to involve "church leaders in the public and political life of their communities and to improve the quality of life in Hudson County." Curtiss Aff., ¶ 1. One manner in which Interfaith sought to effectuate this purpose was to build affordable housing in Hudson County. The unavailability of the Site for this purpose has thwarted this effort. The health of Interfaith's members and the ability to create housing opportunities within Hudson County and on the Site in particular are all related or germane to the purpose of improving the quality of life in Hudson County. As a result, Plaintiffs' have satisfied the second element of the test for associational standing.

■ Lastly, the Court must determine if Interfaith's requested relief "requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc.*, 528 U.S. at 181, 120 S.Ct. 693. It does not. Interfaith wishes to have Honeywell clean up the Site, not provide individual relief to any of its members. As a result, Interfaith can capably represent the in-

terests of the organization without the participation of its individual members. Because Interfaith has met all of the requirements for associational standing, this Court finds that Interfaith as an association/organization, as well as the individual Plaintiffs named in this case, all have standing to pursue their RCRA claim against the Defendants. Accordingly, Honeywell's motion to dismiss for lack of standing is denied and Interfaith's cross-motion for partial summary judgment on the issue of whether they have standing is granted.

## II. Joint Motion by Plaintiff Interfaith and the Grace Defendants as to Honeywell's Liability under RCRA.

### A. Summary Judgment.

The present motion is for partial summary judgment under Rule 56(d)[3] of the Federal Rules of Civil Procedure. Summary judgment eliminates unfounded claims without recourse to a costly and lengthy trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under Federal Rule of Civil Procedure 56(c), summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." *Fed.R.Civ.P.* 56(c). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. A litigant may discharge this burden by exposing "the absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. However, this effort requires more than "simply show[ing] that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In evaluating a summary judgment motion a court must view all evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.,* 475 U.S. at 587, 106 S.Ct. 1348; *Abraham v. Raso,* 183 F.3d 279, 287 (3d Cir.1999) (*citing Boyle v. County of Allegheny Pa.,* 139 F.3d 386, 393 (3d Cir.1998)); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). The Court's role is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue of fact for trial." *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505; *Abraham,* 183 F.3d at 287.

Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."

---

**3.** The full text of Federal Rule of Civil Procedure 56(d) reads:

> If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including

the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

Motions for partial summary judgment serve "the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." Advisory Committee Notes to the 1946 Amendment to Rule 56(d).

Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law determines which facts are material. *Id.* at 248, 106 S.Ct. 2505. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* No issue for trial exists unless the non-moving party can demonstrate sufficient evidence favoring it, such that a reasonable jury could return a verdict in that party's favor. *See id.* at 249, 106 S.Ct. 2505.

## B. Liability under RCRA

Under RCRA, liability can be established by meeting the requirements of Sections 7002(a)(1)(B) and Section 7003. For the purposes of the joint motion by Interfaith and the Grace Defendants, the liability inquiry requires a four-part analysis of whether Honeywell; (1) has contributed or is contributing to, (2) the past or present handling, storage, treatment, transportation, or disposal of, (3) any solid or hazardous waste that, (4) presents an imminent and substantial endangerment to health or the environment. 42 U.S.C. § 6972(a)(1)(B); 3 S. Cooke, The Law of Hazardous Waste, § 15.01[3][a] at 15–6 (2001).

### 1. The "has contributed or is contributing to" the "past or present handling, storage, treatment, transportation, or disposal of" Requirement.

In deciding this partial summary judgment motion, the Court will assume Defendant Honeywell, as successor in interest to Mutual, has contributed or is contributing to previously stored, treated, transported or disposed of hazardous waste at the Roosevelt Drive In Site. This Court observes that these requirements are very broad and encompass practically any conduct relating to hazardous waste by practically any individual or entity. Accordingly, for the purposes of this motion, Honeywell falls within these requirements.

### 2. The "solid or hazardous waste" Requirement.

RCRA provides statutory definitions for the terms solid waste and hazardous waste. Section 1004(27) of RCRA defines the phrase "solid waste" as:

[A]ny garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of Title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) [42 U.S.C. § 2011 et seq.].

42 U.S.C. § 6903(27). Section 1004(5) of RCRA further defines the term "hazardous waste:"

[A] solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly

treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).

Honeywell, in its Response to Plaintiffs' and The Grace Defendants' Statement of Material Uncontroverted Facts Regarding Their Motion For Partial Summary Judgment on the RCRA Claims ("Honeywell 56.1 Response"), admitted that chromium is a solid and hazardous form of waste within the meaning of RCRA. Further, courts have found that chromium, particularly hexavalent chromium, is a hazardous substance under RCRA. *See, e.g., U.S. v. Power Engineering Co.*, 10 F.Supp.2d 1145, 1157–58 (D.Colo.1998), *affirmed* by 191 F.3d 1224, 1231 (10th Cir.1999), *cert. denied*, 529 U.S. 1086, 120 S.Ct. 1718, 146 L.Ed.2d 640 (2000) (finding that hexavalent chromium is clearly a form of hazardous waste and also a form of solid waste under RCRA and Colorado regulations); *Steel Manufacturers Ass'n v. E.P.A.*, 27 F.3d 642, 645 (D.C.Cir.1994) (electric arc furnace dust is considered to be a form of hazardous waste by the EPA because, in part, it contains hexavalent chromium); 40 C.F.R. § 261.24 (Under RCRA, the EPA has classified waste that contains five parts per million (ppm) or more of chromium as hazardous).

It is undisputed that the soil at the Site has been assessed at levels as high at 17,900 ppm. Interfaith and the Grace Defendant Rule 56.1 Statement of Undisputed Material Facts ("Interfaith/Grace 56.1 Statement"), ¶ 5(b); Honeywell 56.1 Response, ¶ 5(b). The groundwater contains concentrations of chromium measured at 708,000 parts per billion (ppb). Interfaith/Grace 56.1 Statement, ¶ 5(c); Honeywell 56.1 Response, ¶ 5(c). The surface water at the Site contains levels of chromium measured at 19,900 ppb. Interfaith/Grace 56.1 Statement, ¶ 5(d); Honeywell 56.1 Response, ¶ 5(d). Consequently, for the purposes of this partial summary judgment motion, this Court finds that chromium is a form of solid or hazardous waste under RCRA.

### 3. The "imminent and substantial endangerment to health or the environment" Requirement.

 The final element of a RCRA citizen suit under Section 7002(a)(1)(B) requires a showing that the solid or hazardous waste at issue may present an imminent and substantial endangerment. Although this analysis is fact-specific, compliance (or noncompliance) with federal or state environmental standards is a determinative factor in assessing whether a particular form of contamination presents the possibility of imminent and substantial endangerment. 3 S. Cooke, The Law of Hazardous Waste, § 15.01[3][e] at 15–11, 15–12 (2001). It should be noted that only the risk of harm, rather than actual harm, must be imminent; In fact, actual harm is not even required under RCRA. 3 S. Cooke, The Law of Hazardous Waste, § 15.01[3][e] at 15–11 n. 45–47. (2001) (*citing Meghrig v. Kentucky Fried Chicken Western, Inc.*, 516 U.S. 479, 486, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) (imminence "implies that there must be a threat which is present now, although the impact of the threat may not be felt until later"); *Dague v. City of Burlington*, 935 F.2d 1343, 1356 (2d Cir.1991), *rev'd in part on other grounds*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); *United States v. Conservation Chem. Co.*, 619 F.Supp. 162, 193 (W.D.Mo.1985)).

 A review of the submissions in this case persuades this Court that the issue of whether there exists an imminent and substantial endangerment to health or the environment in Hudson County because of the Site or whether there is a

present risk of such imminent and substantial harm is question of fact that is in dispute in this case. Essentially, Interfaith, the Grace Defendants and Honeywell disagree as to whether the Interim Remedial Measures taken by Honeywell are sufficient under RCRA. Honeywell asserts it has eliminated any genuine risk to human health by installing and maintaining a soil cap, a concrete slab, and asphalt on the Site. Interfaith and the Grace Defendants, on the other hand, contend that these measures have proved ineffective and that Honeywell's inaction is causing a present and very real environmental threat to human health in Hudson County. In light of this factual dispute, this Court finds that Interfaith and the Grace Defendants' motion for partial summary judgment declaring Honeywell liable under RCRA must be denied and these issues permitted to proceed to trial.

## CONCLUSION

For the foregoing reasons, Honeywell's motion to dismiss Count One of Interfaith's Amended Complaint for lack of standing under RCRA is **denied.** Interfaith's cross motion for partial summary judgment regarding Plaintiffs standing to bring a citizen suit under RCRA is **granted.** Interfaith and the Grace Defendants motion for partial summary judgment on the issue of Honeywell's liability under RCRA is **denied.** An Order accompanies this Opinion.

## ORDER

This matter having come before the Court on motions by Defendant, Honeywell International, Inc. to dismiss Count One of Plaintiff, Interfaith Community Organization's Amended Complaint for lack of standing under section 7002, 42 U.S.C. § 6972 of the Resource Recovery Conservation Act ("RCRA"); and on cross-motion by Plaintiff, Interfaith Community Organization for partial summary judgment on the validity of Plaintiff's standing to bring a citizen suit under section 7002, 42 U.S.C. § 6972 of RCRA; and on motion by Defendants W.R. Grace & Company, Ecarg, Inc., and W.R. Grace, Ltd. and Plaintiff Interfaith Community Organization for partial summary judgment as to Honeywell International, Inc.'s liability under section 7002, 42 U.S.C. § 6972 of RCRA; and the Court having thoroughly reviewed the submissions in support of and in opposition to each of the three motions mentioned above; and for the reasons discussed in the Opinion of this Court filed herewith; and for good cause shown,

IT IS ON THIS 12th DAY OF MARCH 2002

**ORDERED** that Defendant Honeywell International, Inc.'s motion to dismiss Count One of Plaintiff's Amended Complaint for lack of standing is **denied;** and it is further

**ORDERED** that Plaintiff Interfaith Community Organization's motion for partial summary judgment on the issue of standing to bring a citizen suit under RCRA is **granted;** and it is further

**ORDERED** that the joint motion by Interfaith Community Organization and W.R. Grace & Company, Ecarg, Inc., and W.R. Grace, Ltd. seeking partial summary judgment against Honeywell International, Inc. as to liability under RCRA is **denied.**